**EXHIBIT A**

Contract of Sale for New York office, commercial and multi-family residential premises

# Contract of Sale---Office, Commercial and Multi-Family Residential Premises

## Table of Contents

Schedule A. Description of premises (to be attached)
Schedule B. Permitted exceptions
Schedule C. Purchase price
Schedule D. Miscellaneous
Schedule E. Rent schedule (to be attached)
Section 1. Sale of premises and acceptable title
Section 2. Purchase price, acceptable funds, existing
      mortgages, purchase money mortgage and
      escrow of downpayment
Section 3. The closing
Section 4. Representations and warranties of seller
Section 5. Acknowledgments of purchaser
Section 6. Seller's obligations as to leases
Section 7. Responsibility for violations

Section 8. Destruction, damage or condemnation
Section 9. Covenants of seller
Section 10. Seller's closing obligations
Section 11. Purchaser's closing obligations
Section 12. Apportionments
Section 13. Objections to title, failure of seller or
      purchaser to perform and
Section 14. Broker
Section 15. Notices
Section 16. Limitations on survival of representations,
      warranties, covenants and other
      obligations
Section 17. Miscellaneous provisions
Signatures and receipt by escrowee

CONTRACT dated the **30th** day of March, 2018,

Between

**DuPont Street Developers, LLC**

Address:
c/o J Developments, 87-10 Queens Boulevard, Elmhurst, NY 11373
("Seller") and

**DuPont Realty NY LLC**

Address:
199 Lee Avenue, PO Box 693, Brooklyn, NY 11211
("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

## Schedule A
### DESCRIPTION OF PREMISES

The Premises are located at or known as:
Street Address:280 Franklin Street, 10, 14, 22, 26,30 & 32 Clay Street, 55, 57 & 93 DuPont Street, Brooklyn, NY
City:New York    State:New York    Zip:
Tax Map Designation:  Section:        Block:2487        Lot:s: 1, 10, 12, 17, 72, 78, 18, 20, 21, & 57

(⊠ metes and bounds description attached hereto)

## Schedule B
### PERMITTED EXCEPTIONS

    1. Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

    2. Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

    3. The Existing Mortgage(s) and financing statements, assignments of leases and other collateral assignments ancillary thereto.

    4. Leases and Tenancies specified in the Rent Schedule and any new leases or tenancies not prohibited by this contract.

    5. Unpaid installments of assessments not due and payable on or before the Closing Date.

    6. Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants.

    7.    (a)    Rights of utility companies to lay, maintain install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

    (b) Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

    (c) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

    (d) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable. For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto:

## Schedule C
### PURCHASE PRICE

The Purchase Price shall be paid as follows:
    (a) By check subject to collection, the receipt of which is hereby acknowledged by Seller:    **$3,000,000.00**

    (b)  By check or checks delivered to Seller at the Closing in accordance with the provisions of §2.02:    **$52,000,000.00**

    (c)  By acceptance of title subject to the following Existing Mortgage(s):    **$**

    (d)  By execution and delivery to Seller by Purchaser or its assignee of a note secured by a Purchase Money Mortgage on the Premises, in the sum of $      payable as follows:

Interest Rate:    Term:    Monthly payment:    Prep. Fee:    Other provisions:    **$**

Making for a total Purchase Price of:    **$55,000,000.00**

## Schedule D
## MISCELLANEOUS

1. Title insurer designated by the parties (§1.02):none

2. Last date for consent by Existing Mortgagee(s) (§2.03(b)):n/a

3. Maximum Interest Rate of any Refinanced Mortgage (§2.04(b)):n/a

4. Prepayment Date on or after which Purchase Money Mortgage may be prepaid (§2.04(c)):n/a

5. Seller's tax ID Nos (§2.05) #1:    #2:    #3:    #4:

6. Buyer's tax ID Nos (§2.05) #1:    #2:    #3:    #4:

7. Scheduled time and date of Closing (§3.01): Date:120 days from execution and delivery of contract, 2018 Time:10:00 AM o'clock.

8. Place of Closing (§3.01):Office of J Developments, 87-10 Queens Boulevard, Elmhurst, NY or Purchaser's Lending Institution Located in one of the five Boroughs of New York City.

9. Assessed valuation of Premises (§4.10):no representation

10. Fiscal year and annual real estate taxes on Premises (§4.10): Fiscal Year:    Annual Taxes:no representation

11. Tax abatements or exemptions affecting Premises (§4.10):no representation

12. Assessments on Premises (§4.13):no representation

13. Maximum Amount which Seller must spend to cure violations, etc. (§7.02):$250,000.00

14. Maximum Expense of Seller to cure title defects, etc. (§13.02):$250,000.00

15. Broker, if any (§14.01):Interior Development Consulting, LLC and Allied Realty Associates

16. Party to pay broker's commission (§14.01):Seller to pay Interior Development LLC and Purchaser to pay Allied Realty Associates pursuant to separate agreements.

17. Address for notices (§15.01):

    If to Seller:
    c/o J Developments, 87-10 Queens Boulevard, Elmhurst, NY 11373

    with a copy to:
    Jeffrey P. Sharkey PLLC, 2564 Aster Place South, Westbury, NY 11590 and

    If to Purchaser:DuPont Realty NY LLC
    199 Lee Avenue, PO Box 693, Brooklyn, NY 11211

    with a copy to:Dov Tratner, Esq., Tratner and Associates PLLC, 80-02 Kew Gardens Road, Suite 605, Kew Gardens, NY 11415

18. Limitation Date for actions based on Seller's surviving representations and other obligations (§16.01):as set forth in Section 16.01 only

19. Additional Schedules or Riders (§17.08):Rider, Schedule A - Description of Premises, Survey, 2012 Purchase and Sale Agreement with First through Sixth Amendments, Memorandum of Contract, Mutual Rescission of Contract (not executed), Schedule B Title Exceptions and Schedule D List of Environmental Documents.

## Schedule E
## RENT SCHEDULE

(☐ if more than four tenants, check, and annex a rent schedule rider hereto; otherwise, enter information below)

| Name | Apt. No. | Rent | Due | Security |
|---|---|---|---|---|

**Premises will be delivered free from tenancies.**

## Section 1. Sale of Premises and Acceptable Title

§1.01. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract:

(a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvement situated on the Land (collectively, "Building");

(c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway;

(d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; and

(e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). The Premises are located at or known as Street Address: 280 Franklin Street, 10, 14, 22, 26,30 & 32 Clay Street, 55, 57 & 93 DuPont Street, Brooklyn, NY City: Brooklyn State: NY Zip:
Tax Map Designation: Section:          Block: 2487 Lots: 1, 10, 12, 17, 72, 78, 18, 20, 21, & 57

§1.02. Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to:

(a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and

(b) such other matters as (i) the title insurer specified in Schedule D attached hereto (or if none is so specified, then any member of the New York Board of Title Underwriters) shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises and (ii) shall be accepted by any lender described in Section 274-a of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if such acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

## Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage and Escrow of Down payment

§2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto is $55,000,000.00

§2.02. All monies payable under this contract, unless otherwise specified in this contract, shall be paid by:

(a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York or

(b) official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of one-half of one percent of the Purchase Price shall be acceptable for sums payable to Seller at the Closing.

§2.03. (a) If Schedule C provides for the acceptance of title by Purchaser subject to one or more existing mortgages (collectively, "Existing Mortgage(s)"), the amounts specified in Schedule C with reference thereto may be approximate. If at the Closing the aggregate principal amount of the Existing Mortgage(s), as reduced by payments required there under prior to the Closing, is less than the aggregate amount of the

Existing Mortgage(s) as specified in Schedule C, the difference shall be added to the monies payable at the Closing, unless otherwise expressly provided herein.

(b) If any of the documents constituting the Existing Mortgage(s) or the note(s) secured thereby prohibits or restricts the conveyance of the Premises or any part thereof without the prior consent of the holder or holders thereof ("Mortgagee(s)") or confers upon the Mortgagee(s) the right to accelerate payment of the indebtedness or to change the terms of the Existing Mortgage(s) in the event that a conveyance is made without consent of the Mortgagee(s), Seller shall notify such Mortgagee(s) of the proposed conveyance to Purchaser within 10 days after execution and delivery of this contract, requesting the consent of such Mortgagee(s) thereto. Seller and Purchaser shall furnish the Mortgagee(s) with such information as may reasonably be required in connection with such request and shall otherwise cooperate with such Mortgagee(s) and with each other in an effort expeditiously to procure such consent, but neither shall be obligated to make any payment to obtain such consent. If such Mortgagee(s) shall fail or refuse to grant such consent in writing on or before the date set forth in Schedule D or shall require as a condition of the granting of such consent

(i) that additional consideration be paid to the Mortgagee(s) and neither Seller nor Purchaser is willing to pay such additional consideration or

(ii) that the terms of the Existing Mortgage(s) be changed and Purchaser is unwilling to accept such change, then unless Seller and Purchaser mutually agree to extend such date or otherwise modify the terms of this contract, Purchaser may terminate this contract in the manner provided in §13.02.

If Schedule C provides for a Purchase Money Mortgage (as defined in §2.04), Seller may also terminate this contract in the manner provided in §13.02 if any of the foregoing circumstances occur or if Seller is unwilling to accept any such change in the terms of the Existing Mortgage(s).

§2.04. (a) If Schedule C provides for payment of a portion of the Purchase Price by execution and delivery to Seller of a note secured by a purchase money mortgage ("Purchase Money Mortgage"), such note and Purchase Money Mortgage shall be drawn by the attorney for the Seller on the standard forms of the New York Board of Title Underwriters then in effect for notes and for mortgages of like lien, as modified by this contract. At the Closing, Purchaser shall pay the mortgage recording tax and recording fees therefore and the filing fees for any financing statements delivered in connection therewith.

(b) If Schedule C provides for the acceptance of title by Purchaser subject to Existing Mortgage(s) prior in lien to the Purchase Money Mortgage, the Purchase Money Mortgage shall provide that it is subject and subordinate to the lien(s) of the Existing Mortgage(s) and shall be subject and subordinate to any extensions, modifications, renewals, consolidations, substitutions or replacements thereof (collectively, "Refinancing" or "Refinanced Mortgage"), provided that (i) the rate of interest payable under a Refinanced Mortgage shall not be greater than that specified in Schedule D as the Maximum Interest Rate or, if no Maximum Interest Rate is specified in Schedule D, shall not be greater than the rate of interest that was payable on the refinanced indebtedness immediately prior to such Refinancing, and (ii) if the principal amount of the Refinanced Mortgage plus the principal amount of other Existing Mortgage(s), if any, remaining after placement of a Refinanced Mortgage exceeds the amount of principal owing and unpaid on all mortgages on the Premises superior to the Purchase Money Mortgage immediately prior to the Refinancing, an amount equal to the excess shall be paid at the closing of the Refinancing to the holder of the Purchase Money Mortgage in reduction of principal payments due there under in inverse order of maturity. The Purchase Money Mortgage shall further provide that the holder thereof shall, on demand and without charge

~~therefore, execute, acknowledge and deliver any agreement or~~ agreements reasonably required by the mortgagee to confirm such subordination.

(c) The Purchase Money Mortgage shall contain the following additional provisions:

(i) "The mortgagor or any owner of the mortgaged premises shall have the right to prepay the entire unpaid indebtedness together with accrued interest, but without penalty, at any time on or after [insert the day following the last day of the fiscal year of the mortgagee in which the Closing occurs or, if a Prepayment Date is specified in Schedule D, the specified Prepayment Date], or not less than 10 days' written notice to the holder hereof."

(ii) "Notwithstanding anything to the contrary contained herein, the obligation of the mortgagor for the payment of the indebtedness and for the performance of the terms, covenants and conditions contained herein and in the note secured hereby is limited solely to recourse against the property secured by this mortgage, and in no event shall the mortgagor or any principal of the mortgagor, disclosed or undisclosed, be personally liable for any breach of or default under the note or this mortgage or for any deficiency resulting from or through any proceedings to foreclose this mortgage, nor shall any deficiency judgment, money judgment or other personal judgment be sought or entered against the mortgagor or any principal of the mortgagor, disclosed or undisclosed, but the foregoing shall not adversely affect the lien of this mortgage or the mortgagee's right of foreclosure."

(iii) "In addition to performing its obligations under Section 274-a of the Real Property Law, the mortgagee, if other than one of the institutions listed in Section 274-a agrees that, within 10 days after written request by the mortgagor, but not more than twice during any period of 12 consecutive months, it will execute, acknowledge and deliver without charge a certificate of reduction in recordable form (a) certifying as to (1) the then unpaid principal balance of the indebtedness secured hereby, (2) the maturity date thereof, (3) the rate of interest, (4) the last date to which interest has been paid and (5) the amount of any escrow deposits then held by the mortgagee, and (b) stating, to the knowledge of the mortgagee, whether there are any alleged defaults hereunder and, if so, specifying the nature thereof."

(iv) "All notices required or desired to be given under this mortgage shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed to the mortgagor and mortgagee at the addresses specified in this mortgage or to such other parties or at such other addresses, not exceeding two, as may be designated in a notice given to the other party or parties in accordance with the provisions hereof."

(v) The additional provisions, if any, ~~specified in a rider hereto.~~

§2.05. (a) If the sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") are paid by check or checks drawn to the order of and delivered to Seller's attorney or another escrow agent ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in a special bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee need not hold such proceeds in an interest-bearing account, but if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10 day period or if

for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of a court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

### Section 3. The Closing

§3.01. Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D.

### Section 4. Representations and Warranties of Seller

Seller represents and warrants to Purchaser as follows:

§4.01. Unless otherwise provided in this contract, Seller is the sole owner of the Premises.

§4.02. If the Premises are encumbered by an Existing Mortgage(s), no written notice has been received from the Mortgagee(s) asserting that a default or breach exists thereunder which remains uncured and no such notice shall have been received and remain uncured on the Closing Date. If copies of documents constituting the Existing Mortgage(s) and note(s) secured thereby have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals and the Existing Mortgage(s) and note(s) secured thereby have not been modified or amended except as shown in such documents.

~~§4.03. The information concerning written leases~~ (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases (collectively, "Tenancies") set forth in Schedule E attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract:

(a) all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b) no renewal or extension options have been granted to tenants;

(c) no tenant has an option to purchase the Premises;

(d) the rents set forth are being collected on a current ~~basis and there are no arrearages in excess of one month;~~

~~(e) no tenant is entitled to rental concessions or~~ abatements for any period subsequent to the scheduled date of closing;

(f) Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured;

(g) no action or proceeding instituted against Seller by any tenant of the Premises is presently pending in any court, except with respect to claims involving personal injury or property damage which are covered by insurance; and

(h) there are no security deposits other than those set forth in the Rent Schedule.

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

§4.04. If the Premises or any part thereof are subject to the New York City Rent Stabilization Law, Seller is and on the Closing Date will be a member in good standing of the Real Estate Industry Stabilization Association, and, except as otherwise set forth in the Rent Schedule, there are no proceedings with any tenant presently pending before the Conciliation and Appeals Board in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the Conciliation and Appeals Board that have not been complied with by Seller.

§4.05. If the Premises or any part thereof are subject to the New York City Emergency Rent and Rehabilitation Law, the rents shown are not in excess of the maximum collectible rents, and, except as otherwise set forth in the Rent Schedule, no tenants are entitled to abatements as senior citizens, there are no proceedings presently pending before the rent commission in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the rent commission that ~~have not been complied with by Seller.~~

§4.06. If an insurance schedule is attached hereto, such schedule lists all insurance policies presently affording coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.07. If a payroll schedule is attached hereto, such schedule lists all employees presently employed at the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union contract and there are no retroactive increases or other accrued and unpaid sums owed to any employee.

§4.08. If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.09. If a copy of a certificate of occupancy for the Premises has been exhibited to and initialed by Purchaser or its representative, such copy is a true copy of the original and such certificate has not been amended, but Seller makes no representation as to compliance with any such certificate.

§4.10. The assessed valuation and real estate taxes set forth in Schedule D, if any, are the assessed valuation of the Premises and the taxes paid or payable with respect thereto for the fiscal year indicated in such schedule. Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises.

§4.11. Except as otherwise set forth in a schedule attached hereto, if any, if the Premises are used for residential purposes, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (or replacements thereof) listed in such schedule, if any, are and on the Closing Date will be owned by Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

§4.12. Seller has no actual knowledge that any incinerator, boiler or other burning equipment on the Premises is being operated in violation of applicable law. If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.13. Except as otherwise set forth in Schedule D, Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises.

## Section 5. Acknowledgments of Purchaser
Purchaser acknowledges that:

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01, and §9.04, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

§5.02. Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally.

## Section 6. Seller's Obligations as to Leases

§6.01. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld:

(a) amend, renew or extend any Lease in any respect, unless required by law;

(b) grant a written lease to any tenant occupying space pursuant to a Tenancy; or

(c) terminate any Lease or Tenancy except by reason of a default by the tenant thereunder.

§6.02. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant without first giving Purchaser written notice of the identity of the proposed tenant, together with

(a) either a copy of the proposed lease or a summary of the terms thereof in reasonable detail and

(b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof. If Purchaser objects to such proposed lease, Purchaser shall so notify Seller within 4 business days after receipt of Seller's notice if such notice was personally delivered to Purchaser, or within 7 business days after the mailing of such notice by Seller to Purchaser, in which case Seller shall not enter into the proposed lease. Unless otherwise provided in a schedule attached to this contract, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, the rent and additional rent that

would have been payable under the proposed lease from the date on which the tenant's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the amount of the brokerage commission specified in Seller's notice and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease to suit the premises to the tenant's occupancy ("Reletting Expenses"), prorated in each case over the term of the proposed lease and apportioned as of the Closing Date. If Purchaser does not so notify Seller of its objection, Seller shall have the right to enter into the proposed lease with the tenant identified in Seller's notice and Purchaser shall pay to Seller, in the manner specified in §2.02, the Reletting Expenses, prorated in each case over the term of the lease and apportioned as of the later of the Closing Date or the rent commencement date. Such payment shall be made by Purchaser to Seller at the Closing. In no event shall the amount so payable to Seller exceed the sums actually paid by Seller on account thereof.

§6.03. If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract. Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent. Seller shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

§6.04. Seller does not warrant that any particular Lease of Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchaser Price or give rise to any other claim on the part of Purchaser.

## Section 7. Responsibility for Violations

§7.01. Except as provided in §7.02 and §7.03, all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, if applicable, shall be removed or complied with by Seller. If such removal or compliance has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost to effect or complete such removal or compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be required to accept such title and may terminate this contract as provided in §13.02 if

(a) Purchaser's Institutional Lender reasonably refuses to provide financing by reason thereof or

(b) the Building is a multiple dwelling and either

(i) such violation is rent impairing and causes rent to be unrecoverable under Section 302-a of the Multiple Dwelling Law or

(ii) a proceeding has been validly commenced by tenants and is pending with respect to such violation for a judgment directing deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law. All such notes or notices of violations noted or issued on or after the date of this contract shall be the sole responsibility of Purchaser.

§7.02. If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of §7.01 shall exceed the Maximum Amount specified in Schedule D (or if none is so specified, the Maximum Amount shall be one-half of one percent of the Purchase Price), Seller shall have the right to cancel this contract, in which event the sole liability of Seller shall be as set forth in §13.02, unless Purchaser elects to accept title to the Premises subject to all

such violations or liens, in which event Purchaser shall be entitled to a credit of an amount equal to the Maximum Amount against the monies payable at the Closing.

§7.03. Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure to remove or fully comply with the following violations shall not be an objection to title:

(a) any violations of New York City Local Law 5 of 1973, as amended (relating to fire safety in office buildings), if applicable, or

(b) any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except that if Purchaser's Institutional Lender reasonably refuses to provide financing by reason of the violations described in (b) above, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract in the manner provided in §13.02.

§7.04. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

## Section 8. Destruction, Damage or Condemnation

§8.01. The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.

## Section 9. Covenants of Seller

Seller covenants that between the date of this contract and the Closing:

§9.01. The Existing Mortgage(s) shall not be amended or supplemented or prepaid in whole or in part. Seller shall pay or make, as and when due and payable, all payments of principal and interest and all deposits required to be paid or made under the Existing Mortgage(s).

§9.02. Seller shall not modify or amend any Service Contract or enter into any new service contract unless same is terminable without penalty by the then owner of the Premises upon not more than 30 days notice.

§9.03. If an insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereof for no more than one year of those expiring before the Closing.

§9.04. No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§9.06. Seller shall allow Purchaser or Purchaser's representatives access to the Premises, the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

## Section 10. Seller's Closing Obligations

At the Closing, Seller shall deliver the following to Purchaser:

§10.01. A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

§10.02. All Leases initialed by Purchaser and all others in Seller's possession.

§10.03. A schedule of all cash security deposits and a check or credit to Purchaser in the amount of such security deposits, including any interest thereon, held by Seller on the Closing Date under the Leases or, if held by an Institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any lease securities which are other than cash.

§10.04. A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05. All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

§10.06. An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, insurance policies, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

§10.07. (a) Written consent(s) of the Mortgagee(s), if required under §2.03(b), and(b) certificate(s) executed by the Mortgagee(s) in proper form for recording and certifying (i) the amount of the unpaid principal balance thereof, (ii) the maturity date thereof, (iii) the interest rate, (iv) the last date to which interest has been paid thereon and (v) the amount of any escrow deposits held by the Mortgagee(s).

Seller shall pay the fees for recording such certificate(s). Any Mortgagee which is an Institutional Lender may furnish a letter complying with Section 274-a of the Real Property Law in lieu of such certificate.

§10.08. An assignment of all Seller's right, title and interest in escrow deposits for real estate taxes, insurance premiums and other amounts, if any, then held by the Mortgagee(s).

§10.09. All original insurance policies with respect to which premiums are to be apportioned or, if unobtainable, true copies or certificates thereof.

§10.10. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasigovernmental authorities having jurisdiction.

§10.11. Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12. Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof.

§10.13. To the extent they are then in Seller's possession, copies of current painting and payroll records. Seller shall make all other Building and tenant files and records available to Purchaser for copying, which obligation shall survive the Closing.

§10.14. An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

§10.15. Notice(s) to the Mortgagee(s), executed by Seller or by its agent, advising of the sale of the Premises to Purchaser and directing that future bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.

§10.16. If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in §10.01 shall also contain a recital sufficient to establish compliance with such law.

§10.17. Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

§10.18. Any other documents required by this contract to be delivered by Seller.

Section 11. Purchaser's Closing Obligations
At the Closing, Purchaser shall:

§11.01. Deliver to Seller checks in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, plus the amount of escrow deposits, if any, assigned pursuant to §10.08.

§11.02. Deliver to Seller the Purchase Money Mortgage, if any, in proper form for recording, the note secured thereby, financing statements covering personal property, fixtures and equipment included in this sale and replacements thereof, all properly executed, and Purchaser shall pay the mortgage recording tax and recording fees for any Purchase Money Mortgage.

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.03.

§11.04. Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05. Deliver any other documents required by this contract to be delivered by Purchaser.

Section 12. Apportionments

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a) prepaid rents and Additional Rents (as defined in §12.03);

(b) interest on the Existing Mortgage(s);

(c) real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d) wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises whose employment was not terminated at or prior to the Closing;

(e) value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes;

(f) charges under transferable Service Contracts or permitted renewals or replacements thereof;

(g) permitted administrative charges, if any, on tenants' security deposits;

(h) dues to rent stabilization associations, if any;

(i) insurance premiums on transferable insurance policies listed on a schedule hereto or permitted renewals thereof;

(j) Reletting Expenses under §6.02, if any; and

(k) any other items listed in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority:

(a) first to the month preceding the month in which the Closing occurred;

(b) then to the month in which the Closing occurred;

(c) then to any month or months following the month in which the Closing occurred; and

(d) then to the period prior to the month preceding the month in which the Closing occurred.

If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

§12.03. If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing.

## Section 13. Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien

§13.01. Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days or until the expiration date of any written commitment of Purchaser's Institutional Lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first, to remove any defects in or objections to title noted in such title report and any other defects or objections which may be disclosed on or prior to the Closing Date.

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract or if Purchaser shall have any other grounds under this contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey with a credit against the monies payable at the Closing equal to the reasonably estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this contract and the sole liability of Seller shall be to refund the Down payment to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's title company therefor without issuance of a policy, and the net cost of updating the existing survey of the Premises or the net cost of a new survey of the Premises if there was no existing survey or the existing survey was not capable of being updated and a new survey was required by Purchaser's Institutional Lender. Upon such refund and reimbursement, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D (or if none is so specified, the Maximum Expense shall be one-half of one percent of the Purchase Price) to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, other than Existing Mortgages, of which Seller has actual knowledge.

§13.03 Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.02. If Purchaser's title insurance company is willing to insure both Purchaser and Purchaser's Institutional Lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's Institutional Lender reasonably refuses to accept such insurance in lieu of actual payment and discharge, Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

§13.05. Purchaser shall have a vendee's lien against the Premises for the amount of the Downpayment, but such lien shall not continue after default by Purchaser under this contract.

## Section 14. Broker

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any

representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

## Section 15. Notices

§15.01. All notices under this contract shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided.

## Section 16. Limitations on Survival of Representations, Warranties, Covenants and other Obligations

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action base thereon shall be commenced after the Closing. The representations, warranties, covenants and other obligations of Seller set forth in §4.03, §6.01 and §6.02 shall survive until the Limitation Date specified in Scheduled D (or if none is so specified, the Limitation Date shall be the date which is six months after the Closing Date), and no action based thereon shall be commenced after the Limitation Date.

§16.02 The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

## Section 17. Miscellaneous Provisions

§17.01. If consent of the Existing Mortgagee(s) is required under §2.03(b), Purchaser shall not assign this contract or its rights hereunder without the prior written consent of Seller. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of

assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02. This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03. This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§17.04. The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§17.05. This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.06. This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§17.07. As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.08. If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Contract as of the date first above written.

SELLER(S):

_____
DuPont Street Developers LLC
By: Clay Riverview LLC, Bo Jin Zhu, Authorized Signatory

_____

_____

_____

BUYER(S):

_____
DuPont Realty NY LLC
By:                          Title:

_____

_____

_____

RIDER TO CONTRACT OF SALE BY AND BETWEEN DuPONT STREET
DEVELOPERS LLC, AS SELLER, AND DuPONT REALTY NY LLC, AS
PURCHASERS, COVERING PREMISES: 280 Franklin Street, 10, 14, 22, 26,30 & 32
Clay Street, 55, 57 & 93 DuPont Street, Brooklyn, NY
DATED: March 30,   , 201%

The printed part of this contract is hereby modified and supplemented. Wherever there is
any conflict between this Rider and the printed part of this contract, the provisions of this
Rider are paramount and the contract shall be construed accordingly.

Said premises are sold subject also to the following:

1.      (A) State of facts shown on survey  made by  NY Land Surveyor  P.C.
dated May 1, 2017.

(B)      Covenants and restrictions of record, provided same do not render title
unmarketable and are not currently violated.

(C)      Any violations of record affecting the premises except that Seller shall be
responsible for any dollar amount actually due on said violations at the time of the
closing of title, including, but not limited to, boiler and sidewalk violations.

(D)      Real estate taxes, water rates and sewer rents, subject to adjustment as
herein provided.

(E)      Building restrictions and zoning regulations heretofore or hereafter
adopted by any public authority.

(F)      Party Wall agreement or agreements, if any.

(G)      Recorded consents in writing prior to the date hereof, by the Seller or any
former owner of the premises, for the erection of any structure or structures on, under or
above any street or streets on which said premises may abut.

(H)      Possible lack of right to maintain vaults, coal hole covers, coal chutes and
other installations, if any, beyond the building lines; vaults and vault tax, if any.

(I)      Minor Encroachments, if any, of retaining walls, cellar doors and steps,
windows, trim, coping, railings, coal hole covers, chimneys, cornices, ornamental
projections, sidewalk elevators, fences, fire escapes, stoops and areas upon any street or
highway adjoining premises which encroach upon these premises.

(J)      Minor Encroachments, if any, upon, and affixations, if any, to these
premises and/or buildings thereon, or walls, foundations, or appurtenances of buildings
located on adjoining premises.

(K)    Minor Encroachments, if any, of building walls, foundations, or appurtenances, belonging to these premises upon adjoining premises.

(L)    Minor Variations between the record lot lines of these premises and those shown on the tax map.

(M)    INTENTIONALLY BLANK

(N)    Any easement or right of use created in favor of any public utility company for electric, steam, gas, telephone, water, T.V. cable or other service and the right to install, use, maintain, repair and replace wiring, cables, terminal boxes, lines, service connections, poles, mains, facilities and the like upon, under and across the property provided same do not interfere with the current use of the premises.

Purchaser agrees to take subject to the state of facts as shown on the attached survey and survey readings. Mortgage policy to insure against monetary loss caused by the variations, encroachments and/or projections.

2.    Any lien or apparent lien appearing of record against the premises which can be discharged by the payment of money, shall not be an objection to title, provided Seller, allows to Purchaser as an adjustment at the time of closing of title, the amount required for the discharge thereof.   A lien, dischargeable by satisfaction, shall not be deemed an objection to title, if at the time of closing of title, the Seller shall cause to be delivered, a duly executed and acknowledged satisfaction of lien acceptable to purchaser's title company, with the filing fee. The Seller shall have the right to apply the proceeds of the sale to the satisfaction of the lien, but shall not be under any obligation so to do. Judgments against Seller shall not be deemed an objection to title provided the title company gives affirmative insurance that said judgments will not be collected out of the premises without additional cost.

3.    Unpaid franchise taxes affecting title to the premises shall not be an objection to title, provided that the Seller deposits an amount sufficient to cover the same with the title company at the time of closing (or 1.5 times such amount if required by title company); said deposit is to be applied towards payment of the said franchise taxes, and agrees to file the necessary tax returns and purchaser's title company "omits" such objection from purchaser's title policy without additional cost to purchaser.

4.    Notwithstanding any other provisions of this Contract, whether express or implied, if the Seller shall be unable to convey title subject to and in accordance with this agreement, the sole obligation of the Seller shall be to refund Purchaser's down payment made hereunder, and to reimburse the Purchaser for the cost of title examination and survey, and upon the making of such refund and reimbursement, this agreement shall wholly cease and terminate and neither party shall have any further claims against the other by reason of this agreement, and the lien, if any, of Purchaser against the premises shall wholly cease. Seller shall not be required to render title to the premises marketable,

and is not obliged to take any steps or incur any expenses to remove any defects in excess of $250,000.00 of title which may render the Seller's title unmarketable. Purchaser may, nevertheless, accept such title as the Seller may be able to convey, without reduction of the purchase price, and any credit or allowance against the same in excess of $250,000.00, and without any liability on the part of the Seller. The acceptance of a deed by Purchaser shall be deemed to be a full performance of and discharge of any and all agreements and obligations on the part of the Seller to be performed pursuant to the provisions of this agreement, except those, if any, which are herein specifically stated to survive delivery of the deed. The term "cost" of title examination is defined for the purposes of this agreement, as the expense actually incurred by Purchaser for title examination, in no event, however, to exceed the net amount which would be charged by a title company in the City of New York for title examination of the above premises, without issuance of policy, plus the cost to the purchaser of any survey actually obtained, such cost not to exceed, however, the amount charged by such title company for a similar survey. Notwithstanding anything to the contrary, without notice from Purchaser, Seller shall be required to remove all voluntary liens and mortgages against property or Seller.

5.     The purchaser agrees that at least thirty (30) days before the date set forth for the closing of title hereunder, purchaser or purchaser's title company shall provide seller's attorney, with a title report.  If it appears from the objections or exceptions in the title report that time will be required within which to remove the same, then and in that event, seller shall have reasonable adjournment of closing of title, from time to time, within which to clear such objections and/or exceptions. The seller shall have the right to attempt to remedy any defects in title, and for such purpose, anything herein to the contrary notwithstanding, shall be entitled to one or more adjournments of closing for a period not to exceed sixty (60) days in the aggregate and further provided purchaser's mortgage commitment, if any, may be extended or terms not less favorable to purchaser at no additional cost to reach adjourned date(s).

(a) The respective attorneys for the parties are hereby authorized (a) to give any notice which the party is required to give or may give under this contract and (b) to agree to adjournments of closing.

6.     It is understood and agreed that all understandings and agreements heretofore had between the parties hereto are merged in this Agreement, which alone fully and completely expresses their agreement, and that the same has been entered into after full investigation, neither party relying upon any statement or representation made by the other not embodied in this Agreement. Purchaser represents that it has inspected the Premises, the buildings constituting part of the Premises, the uses thereof and the fixtures, equipment and personal property included in this sale, to its satisfaction, that it has independently investigated, analyzed and appraised the value and profitability thereof, that it is thoroughly acquainted with all of the foregoing and that it agrees to take title to the Premises and the fixtures, equipment and personal property included in this sale "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of the Closing. Purchaser expressly acknowledges that, except as expressly provided herein, Seller has not made any

representations or warranties and has held out no inducements to Purchaser to execute this Agreement. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Seller has not made any representations or warranties, in either case express or implied, except as expressly hereinafter set forth, as to (a) the current or future real estate tax liability, assessment or valuation of the Premises; (b) the potential qualification of the Premises for any and all benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, financing, or any other benefits, whether similar or dissimilar to those enumerated; (c) the compliance of the Premises, in its current or any future state with applicable zoning ordinances and the ability to obtain a variance in respect to the Premises and possible noncompliance with said zoning ordinances; (d) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Premises from any source, including but not limited to state, city or federal governments or any institutional lenders; (e) the current or future use of the Premises; (f) the present and future condition and operating state of any and all machinery or equipment on the Premises and the present or future structural and physical condition of the building (latent or patent or otherwise) or its suitability for rehabilitation or renovation; (g) INTENTIONALLY BLANK; (h) the presence or absence of any rules or notices of violations of law issued by any governmental authority, or any obligations affecting the Premises incurred under the Emergency Repair provisions of the Administrative Code of the City of New York, but seller acknowledges that it is responsible for sums up to $250,000.00 in the aggregate to cure same and seller shall pay all accrued fines, as of closing, if any; (I) the layout, leases, rents, income, expense or operation of the Premises. Seller is not liable or bound in any manner by any verbal or written statements, representations, real estate brokers' "setups" or information pertaining to the Premises or the operation, layout, expenses, conditions, income, leases or rents furnished by any real estate broker, agent, employee, or other person, unless the same are specifically set forth herein as a representation of Seller.

7.    The Purchaser will buy from the Seller the fuel oil that is on the premises at the time of closing of title, if any. The amount of fuel oil shall be determined by the representative of the fuel oil company which has been regularly supplying the premises. The price to be paid for the fuel oil shall be the cost price to the Seller, as shown by the bills therefore.

8.    If the payment made on account of the purchase price at the time of the execution of this agreement is by check, and if said check fails due collection and upon five (5) days notice to purchaser to cure, the Seller, at its option, may declare this contract null, void, and of no force and effect, with no further liability to purchaser. If the payment made on account of the purchase price at the time of the execution of this agreement is by wire transfer, and if said wire transfer is not deposited in Seller's account and available to Seller by 5:00 Eastern Standard time on the date that Seller delivers a copy of this contract duly signed by Seller to Purchaser or its attorney, the Seller, at its option, may declare this contract null, void, and of no force and effect, with no further liability to purchaser.

9.      Except as otherwise herein provided, the customs in respect to title closing recommended by the Real Estate Board of New York, shall apply to the apportionments at the closing of title hereunder.

10.     If there be a water meter on the premises, the unfixed meter charge from the time intervening between the date of the last reading thereof and the date of closing herein shall be apportioned on the basis of such last reading, provided however, that Seller shall obtain a final water meter reading or frontage reconciliation, as the case may be, no more than 30 days prior to Closing.

11.     The Purchaser hereby agrees that it shall not record any Notice of Pendency affecting the premises, other than in the event of default by Seller. If the Purchaser shall violate the provisions of the preceding sentence, this agreement, at Seller's option, shall become null and void, and all of the rights of the Purchaser hereunder shall thereupon cease and terminate and the Seller shall have the right to retain the contract deposit, as and for liquidated damages.

12.     Any notice or demand which, under the provisions of this agreement or otherwise, must or may be given or made by any party hereto, shall be in writing, and may be give or made by mailing the same by certified mail, return receipt requested, addressed to the Seller c/o Seller's attorney and to the Purchaser at the address hereinabove set forth or other reputable overnight courier/ messenger service that provide proof of delivery. Either party may designate by notice in writing, a new or other address to which such notice or demand shall thereafter be so given, made or mailed. Any notice given hereunder by mail shall be deemed delivered when received.

13.     The downpayment described in Schedule C (a) (the "Contract Deposit") is to be paid to Madison Title Agency LLC ("Escrow Agent") upon the full execution and delivery of this Agreement by immediately available wired federal funds transfer or by a valid check for deposit  ("Wired Funds") from a bank that is a member of the New York Clearing House Association (the "Association").  The Contract Deposit will not be held in escrow and, upon the receipt by the Escrow Agent of a fully executed Contract, along with (i) a Memorandum of Contract executed by the Seller (regardless of whether it is executed by the Purchaser), (ii) the appropriate ACRIS documents for recording, executed by the Seller (regardless of whether they are executed by the Purchaser), and (iii) wiring instructions for the Seller, the Contract Deposit  will be immediately released to Seller.  **In the event that the Purchaser is entitled, pursuant to the terms of this Contract, to the return of the Contract Deposit, <u>Bo Jin Zhu</u>, personally guarantees the return of the Contract Deposit.**

Escrow Agent's wiring instructions:
Name on Account:    Madison Title Agency, LLC, NY Trust
                                      Account

Bank:                        BankUnited

Routing Number:     267090594

Account Number:     9853876517

Memo:               MTANY-127431

Purchaser and Seller shall, simultaneously herewith, execute a Memorandum of Contract ("Memorandum") in the form of Exhibit E attached hereto, which memorandum shall be recorded by Purchaser promptly after the execution of this Agreement.  In the event the contract is cancelled and the Purchaser becomes entitled to a return of the downpayment in accordance with the terms of the contract the Parties will execute and acknowledge a Rescission of Contract, in the form of Exhibit F attached hereto, upon the return of the downpayment

13.1  (a) In the event any money is placed in escrow pursuant to this contract or any amendment or extension thereof, the escrow agent shall be the Seller's attorney ("Escrowee") and the Escrowee shall hold the proceeds thereof in escrow in a special IOLA bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this paragraph. Escrowee shall hold such proceeds in an interest bearing account, and any interest earned thereon shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties shall be furnished to Escrowee upon request. At the closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 5 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such ten (10) day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of a court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)     The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs,

claims and expenses, including reasonable attorneys, fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of the Escrowee and in the event of such bad faith, etc., deposit payment shall be deemed to have been paid to seller.

(c)     Upon delivery of the deposit to either Purchaser, Seller or a court of competent jurisdiction under and pursuant to the provisions of this paragraph, the escrowee shall be relieved of all liability, responsibility or obligation with respect to or arising out of the deposit and any and all of its obligations therefrom.

(d)     Escrowee shall not have any liability or obligation for loss of all or any part of the deposit by reason of the insolvency or failure of the institutions of depository with whom the deposit has been made. The parties acknowledge that the escrowee's intention is to make the deposit with a depository which shall be a commercial bank or savings bank doing business in the State of New York.

(e)     If a party or the parties deposit any sum of money with the title company at closing the disposition of such escrowed funds shall be governed by the terms of the agreement between the party(ies) and the title company.

14.     The provisions of Section 5-1311 of the General Obligation Law, known as the Uniform Vendor and Purchaser Risk Act shall control, provided, however, that for the purpose of Section 5-1311 a "material part" of the premises shall be deemed "destroyed" if the damage exceeds the greater of $100,000 or 3% of the purchase price, and, provided further however, that any abatement in the purchase price, which the Purchaser may be entitled to by reason of an immaterial destruction or loss, as provided for in said Act, shall in no event exceed (a) the actual amount of insurance moneys collected by the Seller for such loss in case of partial destruction by fire or other causes covered by insurance carried by the Seller or (b) the net amount received by the Seller in the case of an immaterial taking by eminent domain for the part so taken. In the event the moneys covering the above contingencies have not been collected at the time set for closing, all rights with respect thereto shall be assigned by the Seller to the Purchaser at the time of closing and the Purchaser shall accept such assignment in lieu of any abatement. During the term of this Agreement, Seller shall not adjust any insurance claim for damage to the property without Purchaser's prior written consent, which consent shall not be unreasonably withheld. In the event of a material destruction, purchaser has the right to cancel the contract or in the event purchaser does not cancel the contract as herein provided, Purchaser may not bring an action for specific performance with an abatement in the price, but may acquire title subject to the damaged condition without an abatement of the purchase price, in which event Seller shall assign to the Purchaser the fire insurance proceeds. Seller shall maintain replacement value insurance on the premises until closing.

15.     All adjustments and apportionments shall be made on the basis of a 30-day month regardless of the number of days actually in the month of closing.

16.    Irrespective of the place of execution of performance, this Agreement shall be governed by and construed in accordance with the laws of the State of New York. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. If any words or phrases in this Agreement shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Agreement and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated. All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

17.    This document is not an offer by the Seller and under no circumstances should this document have any binding effect upon the Purchaser or the Seller unless and until the Purchaser and the Seller shall have executed the same and have delivered counterparts hereof to each other.

18.    Except as herein otherwise provided, all representations and warranties contained herein or in any certificate or instrument delivered pursuant to or in connection with this Agreement shall be deemed conditions to closing and shall not survive the closing. No action based on any representation, warranty or obligation that survives the closing shall be commenced after the expiration of the period of time by which such representation or obligation survives the Closing, if any. All agreements contained herein shall be deemed conditions to closing and shall not survive the closing unless by the express terms of this Agreement they are made to survive. The acceptance of the deed by Purchaser shall be deemed to be full performance and discharge of every obligation on the part of the Seller to be performed under this Agreement.

No assignment by Purchaser of this Agreement shall be effective unless and until a copy thereof, together with an assumption by the assignee of all of Purchaser's obligations hereunder, has been delivered to Seller at least ten (10) business days prior to the Closing Date. Purchaser shall NOT have the right to assign this contract.

19.    The parties agree that the down payment made hereunder shall be liquidated damages in the event of a material uncured default hereunder by Purchaser resulting in failure to close, it being agreed that it shall be difficult, if not impossible, to determine Seller's damages in the event of such default.

20.    Either party may elect to conduct this transaction as part of a 1031 Tax Free Exchange. The other party agrees to execute any documentation that is reasonable and necessary to satisfy the requirements of the exchange so long as they are prepared by the requesting party. The entire cost of the preparation of the documentation shall be borne by the requesting party.

21.      (a) Seller shall make a good faith written request to cause the holder of the mortgage ("**Holder**") encumbering the Property (the **"Existing Financing"**) to deliver at Closing an assignment of the Existing Financing to Purchaser's new lender (provided that no guarantees or indemnities delivered by any Seller to its lender shall be assigned to Purchaser's lender), and further, provided that Purchaser's lender delivers a release in favor of Seller, releasing Seller from any obligations under the Existing Financing arising after Closing, in form satisfactory to Seller. Such assignment shall be without representation from or recourse by the Holder. Purchaser acknowledges that Seller makes no representation of its ability to deliver an assignment from the Holder, and that "reasonable efforts" shall mean a request by Seller to the Holder. Nothing herein shall require Seller to make any payments or to take any other actions in order to obtain the Holder's agreement to such assignment. Purchaser agrees to indemnify, defend and hold Seller harmless from and against any claims, damages, losses, liabilities, judgments, costs and expenses, including, but not limited to, reasonable attorneys' fees and disbursements arising from the assignment of the Existing Financing thereof, such indemnity to survive the Closing.

(b). Purchaser shall pay to the Existing Lender all of the Existing Lender's standard and reasonable costs and expenses in connection with an assignment of the Existing Financing including, but not limited to all processing fees, application fees, attorneys' fees, recording fees and other out-of-pocket costs and expenses.

(c) The Purchaser's obligations under this contract are NOT subject to any mortgage contingency or the ability of the Purchaser to obtain financing for all or part of the purchase price.

22.      Seller shall cooperate in all reasonable respects with the title or abstract company chosen by purchaser to provide title insurance. In furtherance and not in limitation of the foregoing, at or prior to the Closing, Seller (and/or its general partners or managing members) shall deliver to Madison Title Agency LLC such title affidavits, certificates, other instruments and documentary evidence as are reasonably requested by Purchaser's title or abstract company and customarily furnished in connection with a transaction of the nature contemplated by this Agreement, including, without limitation, such affidavits related to work and repairs with respect to the Property and/or showing that any judgments, bankruptcies or other returns are not against Seller if any title commitment discloses judgments, bankruptcies or other returns against other persons having names the same or similar to that of Seller. Notwithstanding the foregoing, in the event that Purchaser's title or abstract company shall not be willing to issue an owner's title insurance policy, in accordance with the terms of this Agreement, and such other reputable national title insurance company (licensed to do business in the State of New York) chosen by Seller (**"Seller's Chosen Title Company"**) shall be willing to so issue such an owner's title insurance policy, then for all purposes hereunder Seller's Chosen Title Company shall be the title insurer in connection with the transactions contemplated in this Agreement.

23.      (a) Notwithstanding Seller's disclaimer of any Seller representation and warranty contained in the Agreement, and except as noted in paragraph 24 regarding the

NYSDEC Order and Petroleum Spill Response Program, and as provided in Schedule D, Seller represents that as of the date hereof and as of the Closing Date: (i) the Seller have complied in all material respects with all Environmental Laws and have not received notice of any pending or threatened Environmental Action relating to the Seller or any prior owner regarding the Property; (ii) the Seller nor any prior owner has received any notice from any Authority indicating that the Property or any real property adjacent thereto has been or may be placed on any federal, state, or local law list as a result of the presence of Hazardous Materials or violation of Environmental Law; (iii) no Hazardous Materials have been used, manufactured, generated, sold, handled, treated, transported, stored or disposed of by the Seller at the Property; (iv) no Hazardous Materials have spilled, discharged, Released, emitted, injected or leaked from, in, on, or migrated to or from the Property; (v) the Property is not subject to any Environmental Lien; (vi) Seller has provided Purchaser with copies of all reports, audits, studies or analyses of any kind whatsoever in the possession, custody or control of the Seller relating to Hazardous Materials at or in connection with the Property or any Environmental Action affecting the Property. to the Knowledge of Seller, there are no pending or threatened Environmental Actions brought under any Environmental Law or with respect to any Environmental Liabilities against the Premises. Seller's representations and warranties shall survive Closing for a period of 3years. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be -joined in any action brought under any 'Environmental Laws or with respect to any Environmental Liabilities. The term "Hazardous Materials" means (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum, petroleum products and petroleum-derived substances, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof; (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, arno site, crocidolite; tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "Asbestos"), (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, (h) lead-based, paint, (i) pesticides and (j) any other chemicals, materials or substances regulated under any Environmental Law, or defined as or included in the definition of "hazardous substances," "hazardous wastes," "extremely hazardous substances," "hazardous materials," "hazardous constituents," "toxic substances," "pollutants," "contaminants," or any similar denomination intended to classify or regulate such chemicals, materials or substances by reason of their toxicity, carcinogenicity, ignitability, corrosivity or reactivity or other characteristics under any Environmental Law. The term "Environmental Laws" means all federal, state, local or common laws, statutes, ordinances, codes and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments (including any judicial or administrative interpretations, guidance, directives, policy statements or opinions) relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface,

water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos (including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including, without limitation, 29 C.F.R. Sections 1910.1001 and 1926.58), applicable New York State and New York City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments and any state or local counterpart or equivalent of any of the foregoing, and any related federal, state or local transfer of ownership notification or approval statutes. The term "Environmental Action" means any complaint, summons, citation, notice, directive, order, claim, litigation, third party investigation, judicial or administrative proceeding, judgment, letter or other communication from any Governmental Authority or any third party involving violations of Environmental Laws or releases, discharges, leaks of Hazardous materials in, on, or migration from the Property.

Purchaser, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller and the other Seller Parties from any and all rights, claims and demands at law or in equity, whether known, or unknown: at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Property, including, without limitation, any claim for indemnification or contribution arising under any Environmental Law. The term "Environmental Liabilities" means any claims, judgments, damages (including punitive damages), losses, penalties, fines, liabilities, encumbrances, liens, violations, costs and expenses (including attorneys' and consultants' fees) of investigation, remediation, monitoring or defense of any matter relating to human health, safety or the Environment of whatever kind or nature by any party, entity or authority, (A) which are incurred as- a result of (i) the existence of Hazardous Materials in, on, under, at or emanating from the Premises, (ii) the offsite transportation, treatment, storage or disposal of Hazardous Materials generated by the Seller, (iii) the violation of any Environmental Laws or (B) which arise under the Environmental Laws. All references in this section to Seller shall include any subsidiaries thereto, and all predecessors thereto, and any person or entity the liabilities of which, pursuant to the Environmental Laws, contractually, by common law, by operation of law or otherwise, Seller may have succeeded to.

(b)      Purchaser shall indemnify, defend, release and hold harmless Seller from any and all claims, judgments, damages (including punitive damages), losses, penalties, fines,

liabilities, encumbrances, liens, violations, costs and expenses (including attorneys' and consultants' fees) of investigation, remediation, or monitoring, or defense of any matter relating to human health, safety or the environment of whatever kind or nature by any party, entity or authority, whether contingent or -choate, which (A) arise out of or relate to the environmental condition of the Premises, (B) arise out of any Environmental Laws, or (C) arise out of or are incurred as a result of (i) the presence or release of Hazardous Substances in, on, under, at, to or emanating from the Premises prior to or after the Closing, (ii) the offsite transportation, treatment, storage or disposal of Hazardous Substances from the Premises prior to or after the Closing, (iii) the violation of or non-compliance with any Environmental Laws prior to or after the Closing, or (iv) exposure to any Hazardous Substances, noises, odors, vibrations or other conditions existing at or relating to the Premises prior to or after the Closing, which obligation shall survive the Closing.

(c)     In furtherance of Purchaser's covenants contained in this Section 23, Purchaser agrees to perform any and all necessary remediation required in order to obtain from the New York State Department of Environmental Conservation a "No Further Action" letter. The foregoing obligation shall survive the Closing and shall be secured by the L/C.

24.     POST-CLOSING ENVIRONMENTAL REMEDIATION

(a)     As used in this Contract, the following terms shall have the meanings ascribed to them below:

"Environmental Claims" refers to any complaint, summons, citation, notice of violation, notice of potential liability, directive, order, claim, litigation, investigation, proceeding, judgment, letter, or other communication from any governmental agency, department, bureau, office, or other authority, or any third party involving violations of Environmental Laws or Releases of Hazardous Materials at or from the Premises.

"Environmental Conditions" refers to Releases of Hazardous Materials at or from the Premises requiring a Remedial Action or violations of Environmental Laws.

"Environmental Lien" means any lien, security interest, charge or other encumbrance for Environmental Liabilities incurred or imposed by a Government Authority.

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers, or other closed receptacles containing Hazardous Materials) into the environment.

"Remedial Action" means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any other way address Hazardous Materials in the indoor or outdoor environment; (ii) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public

health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (iv) any other actions required pursuant to NYSDEC Program Policy DER-10 "Technical Guidance for Site Investigation and Remediation".

(b) Environmental Inspection.

A.       Seller represents and Purchaser acknowledges that a portion of the Premises has been listed on the New York State Registry of Inactive Hazardous Waste Disposal Sites in New York State as Site No.. 224136 known as the "Former NuHart Plastic Manufacturing pursuant to Environmental Conservation Law (ECL) § 27-1305 and that Seller is implementing a remedial program pursuant to an Order on Consent and Administrative Settlement with the New York State Department of Environmental Conservation ("NYSDEC"), Index # R2-0654-11-10 (the "NYSDEC Order"). Purchaser also acknowledges that a portion of the Premises is listed on the NYSDEC Spills Database as Spill 06-01852 for petroleum discharge from former underground storage tank and that Seller is implementing a remedial program under the supervision of the NYSDEC (the "Petroleum Spill Response Program"). Seller represents and Purchaser acknowledges that a portion of the Premises has been designated as an E-138 Hazmat site by the City of New York.

B.       Seller also represents and Purchaser acknowledges that Seller has provided to Purchaser the environmental reports identified on Schedule D annexed hereto (collectively, the "Environmental Reports"). Except as specifically set forth in this Agreement, Seller has not made and makes no representations or warranties, expressed or implied, with respect to the Environmental Conditions of the Premises, and specifically disclaims any representation or warranty regarding the presence , or absence of Hazardous Materials at, to, under or about the Premises or the compliance or noncompliance with Environmental Laws. The disclaimer set forth herein shall not be affected or limited by the delivery by Seller to Purchaser of any Environmental Reports. Purchaser agrees that the Environmental. Reports provided to Purchaser or its consultants by Seller shall not be deemed representations or warranties of Seller, that Seller has provided the Environmental Reports to Purchaser for Seller's own benefit to facilitate the Environmental Inspection Period. Purchaser shall keep any information generated during the Environmental Inspection Period as confidential unless required by law and shall not disclose such to any third party without prior approval of Seller.

C. EXCEPT AS SET FORTH HEREIN, THE PREMISES IS HEREBY CONVEYED AND ACCEPTED IN ITS "AS IS, WHERE IS" CONDITION ON THE CLOSING DATE, WITH NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, PURCHASER DOES HEREBY WAIVE, RELEASE, AND DISCHARGE SELLER FROM AND AGAINST ALL ENVIRONMENTAL LIABILITIES. ALL REFERENCES IN THIS SECTION 24 TO SELLER SHALL INCLUDE ANY SUBSIDIARIES
THERETO, AND ALL PREDECESSORS THERETO, AND ANY PERSON OR ENTITY THE LIABILITIES OF WHICH, PURSUANT TO THE ENVIRONMENTAL LAWS, CONTRACTUALLY, BY COMMON LAW, BY OPERATION OF LAW OR OTHERWISE, SELLER MAY HAVE SUCCEEDED TO.

(c) Purchaser's Environmental Covenants.

A.      Upon execution of this Agreement, but prior to Closing, Seller shall retain all responsibility for implementing the remedial program under the NYSDEC Order and the Petroleum Spill Response Program and obtaining a Certificate of Completion (or its reasonable equivalent) with a Covenant not to sue from NSYDEC confirming that all obligations under the NYSDEC Order and Petroleum Spill Response Program have been completed. In addition, prior to submission to NYSDEC, Seller shall provide Purchaser with draft copies of workplans or reports required to be submitted to the NYSDEC under the NYSDEC Order or the Petroleum Spill Response Program for review and approval by Purchaser such approval not to be unreasonably withheld, conditioned or delayed and shall incorporate Purchaser's reasonable comments, if any. Purchaser shall have the right, within ten (10) business days of its receipt of said workplans or reports, to reject or require modifications of Seller's proposed workplans provided if Purchaser does not respond in writing to Seller within ten (10) business day period set forth above, Purchaser's approval shall be deemed given. Seller shall also not initiate any Dispute Resolution Procedure with NYSDEC until obtaining written consent of Purchaser.

B.      Upon Closing Purchaser shall assume responsibility for implementing the remedial program under the NYSDEC Order and the Petroleum Spill Response Program, and obtaining a Certificate of Completion (or its reasonable equivalent) with a covenant not to sue from NYSDEC confirming that all obligations under the NYSDEC Order and Petroleum Spill Response Program have been completed. Purchaser shall also assume all of Seller's obligations to 49 DuPont Realty Corp. pursuant to the provisions of the following Agreements ("collectively referred to herein as the "Prior Sale Documents"):

    Purchase and Sale Agreement between 49 DuPont Realty Corp. ("Prior Seller") and Dupont Street Developers LLC dated as of the 8th day of June, 2012,
        First Amendment to Purchase and Sale Agreement dated as of June 26, 2012 ;
        Second Amendment to Purchase and Sale Agreement dated as of August 8, 2012;
        Third Amendment to Purchase and Sale Agreement dated as of December 11, 2012;
        Fourth Amendment to Purchase and Sale Agreement dated as of December 12, 2013;
        Fifth Amendment to Purchase and Sale Agreement dated as of February 26, 2014; and
        Sixth Amendment to Purchase and Sale Agreement dated as of April 9, 2014.
(Copies of which [redacted as to price] are attached collectively as Exhibit _____)

C.      As a condition precedent to Seller's obligation to sell the Premises:
1.      Purchaser shall either enter into a new order on consent with the NYSDEC or amend the NYSDEC Order to add Purchaser as a respondent to the NYSDEC Order, and
2.      To ensure that Purchaser satisfies its obligations under this Agreement to implement and complete its obligations in Subparagraphs (c)(A) and (d) of this Section 24, Purchaser shall prior to the Closing deliver to Seller for delivery by Seller to 49 DuPont Realty Corp. an irrevocable standby letter of credit in the face amount of $3,950,000.00 (the "L/C"), naming 49 DuPont Realty Corp. as beneficiary, to secure each and all indemnity and defense obligations of Purchaser above, and drawable by sight

draft deliverable by 49 DuPont Realty Corp. stating that Purchaser (or its successor(s) in interest) have breached such indemnity or defense obligations (or drawable by 49 DuPont Realty Corp. at any time within 30 days prior to the L/C expiration date), and otherwise from an issuing bank and containing such terms and conditions as are reasonably acceptable to 49 DuPont Realty Corp. so that 49 Realty Corp. releases and returns to Seller the existing letters of credit that Seller has posted naming 49 DuPont Realty Corp as beneficiary. The LC shall provide that upon the conveyance of the Premises, the beneficiary of the L/C shall be entitled to draw thereon unless a substitute letter of credit in form and substance satisfactory to the beneficiary is delivered to the beneficiary by the party to whom the Premises are conveyed. (d) Purchaser Release and Indemnity Purchaser hereby irrevocably waives all such contractual, statutory, or common law rights and remedies against Seller for any Environmental Claims and Environmental Liabilities. Purchaser further releases and holds Seller harmless from any and all Environmental Claims and Environmental Liabilities. Purchaser hereby agrees to indemnify and defend Seller from and against any Environmental Claims and Environmental Liabilities.
(e) Survival.
The provisions of this Section 24 shall survive the Closing and delivery of the Deed.

      25.     Seller may file and/or prosecute an application for the reduction of the assessed valuation of the Premises or any portion thereof for real estate taxes or a refund of Property Taxes previously paid (a "Tax Certiorari Proceeding") to the City of New York for any fiscal year. Seller shall have the right to withdraw, settle or otherwise compromise Tax Certiorari Proceedings affecting real estate taxes assessed against the Premises (i) for any fiscal period prior to the fiscal year in which the Closing shall occur and which does not affect Property Taxes for the current fiscal year without the prior consent of Purchaser, and (ii) for the fiscal year in which the. Closing shall occur, provided Purchaser shall have consented with respect thereto, which consent shall not be unreasonably withheld, delayed or conditioned. The amount of any tax refunds (net of attorneys' fees and other costs of obtaining such tax refunds) with respect to any portion of the Premises for the tax year in which the Apportionment Date occurs shall be apportioned between Seller and Purchaser as of the Apportionment Date.  If, in lieu of a tax refund, a tax credit is received with respect to any portion of the Premises for the tax year in which the Apportionment. Date occurs, then  within thirty (30) days after receipt by Seller or Purchaser, as the case may be, of evidence of the actual amount of such tax credit (net of attorneys' fees and other costs of obtaining such tax credit), the tax credit apportionment shall be readjusted between Seller and Purchaser, and  within thirty (30) days of realization by Purchaser of a tax savings on account of such credit, Purchaser shall pay to Seller an amount equal to 'its proportionate share of the savings realized. All refunds, credits or other benefits applicable to any fiscal period prior to the fiscal year in which the Closing shall occur shall belong solely to Seller (and Purchaser shall have no interest therein) and, if the same shall be paid to Purchaser or anyone acting on behalf of Purchaser, same shall be paid to Seller within fifteen (15) days following receipt thereof. The provisions of this Section 24 shall survive the Closing.

26.  The closing date specified in Paragraph 7 of Schedule D of the Contract of Sale shall be on or about 120 days from the delivery of a copy of this contract signed by the Seller to the Purchaser or it's attorney.

27.  This contract may be executed in counterparts each of which when combined shall constitute a complete contract.

28.  A fax or email signature on the contract of sale shall be considered an original in all respects.

29.  Seller will not enter into any new leases for the premises or renew any existing leases prior to the closing.

30  Purchaser shall have the right, at Purchaser's sole discretion, to submit plans to the New York City Department of Buildings and other necessary governmental authorities necessary for Purchaser's intentions to develop the Property after Closing. Seller shall cooperate with Purchaser, at no cost to Seller, with all necessary submissions, including with the execution of submissions that require Seller's execution. In addition, Purchaser, at its sole cost and expense, shall have the right to have the Premises inspected and to obtain such reports, surveys, and assessments with respect to the Premises that it deems necessary, including but not limited to surveys, engineering reports, soil borings and Phase I and/or Phase II environmental assessments. Seller agrees to cooperate with Purchaser in facilitating such reports, surveys and assessments, including but not limited to by providing reasonable access to the Premises, all at no cost to Seller.

A.    Purchaser's Indemnification for Damage from Inspections. If any material* injury or damage to the Property is caused by the activities or operations of Purchaser or Purchaser's Representatives during the Review Period, Purchaser shall immediately repair and restore, at its sole cost and expense, the Property to its former condition to the extent reasonably practical. Purchaser shall be responsible for, and shall acquit, release, and forever discharge and defend, indemnify and hold harmless Seller from and against, any and all Claims that arise out of or relate to, in any way, Purchaser's or Purchaser's Representatives' entry, activities or operations on, or use or occupancy of, the Property related to such inspections. The terms and provisions of this Section shall survive, as applicable, the termination of this Agreement and Seller can enforce this obligation notwithstanding any other provision herein which relieves Purchaser of any liability in the event of termination of this Agreement.
* which is defined any cost to repair such injury or damage exceeds $1500.00

B.    Insurance. Purchaser shall cause commercial general liability coverage of not less than Two Million Dollars ($2,000,000) per occurrence to be carried by Purchaser or its agents; automobile liability insurance in amounts of not less than Two Million Dollars ($2,000,000.00); and workers compensation and employer's liability insurance as required by the law of the state of New York to be carried by Purchaser or its agents, covering 'liabilities concerning its activities on the Property. Purchaser's insurance policy(ies) shall: i) cover Seller as additional insured for liabilities arising from or

assumed under this Agreement; and ii) be primary as to all other policies (including any deductibles or self-insured retentions). It is further agreed that Purchaser and its insurer(s) providing coverage shall waive all rights of subrogation and/or contribution against Seller and its affiliates to the extent liabilities are assumed by the Purchaser. Prior to commencement of any activities on the Property, Purchaser agrees to deliver an original (not a copy or facsimile) certificate of insurance to Seller evidencing the required coverage and providing that at least thirty (30) days prior notice be delivered to Seller by the insurer prior to termination, cancellation, or a material change in the policy. Purchaser shall ensure that Purchaser's Representatives are adequately insured without necessity of duplicating Purchaser's required insurance.

C.      Waste Disposal. To the extent permitted by law, Purchaser will be deemed to be the generator of all wastes caused by or originating from any Environmental Testing conducted by purchase, including, without limitation, any contaminated soil, sediment, groundwater, surface water, piping, buried structures or other substance or materials that Purchaser or any of Purchaser's Representatives encounter, excavate, dredge or remove. Purchaser shall sign all manifests for transportation and disposal of any such wastes without reference to Seller or any of its affiliated companies on the manifests. Copies of all such manifests shall be provided to the Seller. Within 10 days of completing any Environmental Testing, Purchaser shall remove from Seller's property all such wastes generated by Purchaser's activities and properly dispose of such wastes at an appropriately
licensed solid waste disposal facility. Purchaser and Purchaser's Representatives shall ensure waste materials are properly contained and managed until they are properly disposed of.

D.      Drugs, Alcohol, and Firearms. While on the Property, neither Purchaser nor Purchaser's Representatives shall be in possession of a firearm, or use, possess, sell, distribute, or be under the influence of alcohol or illicit or non-prescribed controlled drugs or substances at any time. Upon non-compliance with the preceding sentence, or upon reasonable cause for suspicion, Seller shall have the right to immediately remove Purchaser or Purchaser's Representatives.

31.     The obligation of Purchaser to effect the Closing shall be subject to the fulfillment (or written waiver thereof by Purchaser) by Seller at or prior to the Closing Date of the following conditions:

Representations and Warranties. The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date.

(ii)      Performance of Obligations. Seller shall have executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Seller hereunder on the Closing Date; and in all material respects performed all other obligations required to be performed by Seller under this Agreement on or prior to the Closing Date.

(iii)     Title Insurance. Delivery at the Closing of the standard current form of American Land Title Association (ALTA) owner's policy of title insurance (the "Title Policy"), or an irrevocable commitment to issue the same, with liability in the amount of the Purchase Price issued by the Title Company, insuring that fee title to the Premises vests in Purchaser subject only to the Permitted Encumbrances.

(iv)    Vacant Premises. Delivery of the Premises at Closing with no leases, tenancies or other use or occupancy agreements, whether oral, written or otherwise, affecting the Premises, and no tenants or subtenants occupying the Premises or any portion thereof.

(v)    No order or injunction or any court or administrative agency of competent jurisdiction nor any statute, rule, regulation or executive order promulgated by any governmental or quasi-governmental entity of competent jurisdiction shall be in effect as of the Closing which restrains or prohibits the transfer of the Premises in accordance with the terms of this Agreement; and

(vi)    No action, suit or other proceeding shall be pending which shall have been brought by any person or entity (other than the parties hereto and their affiliates) to restrain, prohibit or change in any material respect the purchase and sale of the Premises in accordance with the terms of this Agreement, or otherwise affect the use or development of the Premises.

(vii)    Seller shall have delivered, in accordance with the Prior Sale Documents an irrevocable standby letter of credit in the face amount of $750,000.00 (the "Seller L/C"), naming 49 DuPont Realty Corp. as a beneficiary, which Seller L/C shall be drawn upon in accordance with the Prior Sale Documents. In the event that, in accordance with the Prior Sale Documents, Purchaser is entitled to reduce the amount of the letter of credit required to held by 49 Realty Corp., or is required to reimbursement from the L/C, the Seller shall only be entitled to receive reimbursement from, or a reduction in, the Seller L/C once 49 Realty Corp. releases and returns to Purchaser the full L/C. In addition, in the event that 49 Realty Corp., to the extent permitted by the Prior Sale Documents, increases the amount of the Letter of Credit required pursuant to the Prior Sale Documents, Seller shall be responsible to deliver the letter of credit for the applicable increased amount to 49 Realty Corp. This paragraph shall survive Closing.

32.    Representations and Warranties of the Parties; Certain Covenants.

a.    Seller represents to Purchaser that the following are true and correct as of the date hereof and shall be true and correct in all material respects as of the Closing:

b.    Seller is a limited liability company validly existing and in good standing under the laws of the State of its formation and has the requisite power and authority to enter into and to perform the terms of this Agreement.

c.    Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transaction contemplated hereby have been duly authorized by all requisite action of Seller. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally).

d.    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller.

     e.    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "Code").

     f.    There are no Service Contracts that will be binding on Purchaser or the Property after the Closing.

     g.    To the best of Seller's knowledge, there is no material litigation, action, arbitration or proceeding pending or threatened in writing against Seller or the Property, before any federal, state, municipal or governmental department, commission, board, bureau, agency or instrumentality, which could, if adversely determined, (i) prohibit Seller from consummating the transaction contemplated by this Agreement, or (ii) adversely affect the use of the Property.

     h.    Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Property.

     i.    Seller has not granted to any party any right or option to purchase all or any portion of the Property.

     j.    Seller has not transferred or agreed to transfer any development or air rights appurtenant to the Real Property.

     k.    Seller agrees to terminate, as of the Closing, any employees employed by Seller in connection with the Property and there are no employees whose employment Purchaser shall be obligated to assume. Seller is not a party to any labor, union or collective bargaining contract or similar agreement.

     l.    The individual executing this Agreement on behalf of Seller has the authority to do so and the power to bind such entity thereby.

     m.    Except as disclosed herein, there are no Environmental Actions relating to the Property.

     n.    Seller is in compliance with the Prior Sale Documents and Seller has not received any notice of any default from the Prior Seller.

     References to the "knowledge", "best knowledge" or "actual knowledge" of Seller or words of similar import shall refer only to the current actual (as opposed to implied or constructive) knowledge of <u>Bo Jin Zhu</u> (the "Knowledge Party") and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller or any parent, subsidiary or affiliate of Seller or to any other officer, director, member, partner, agent, manager, representative or employee of Seller or to impose upon the Knowledge Party any duty to investigate the matter to which such current actual knowledge, or the absence thereof, pertains.

33.    In the event that (i) the Prior Seller agrees to allow Seller to waive the indemnification of Seller by Purchaser herein in this Agreement and (ii) Seller provides written notice to Purchaser that releases Purchaser from any indemnifications of Seller; then in that case the Purchase Price herein shall be increased by an amount of One Million Five Hundred Thousand ($1,500,000) Dollars less any monies expended by Purchaser on environmental insurance for the purpose of insuring Purchaser from the environmental liabilities herein.

34.    Purchaser may seek, at Purchaser's sole discretion, to procure and bind an environmental insurance policy to cover potential liabilities arising out of this Agreement and ownership of the Premises, including Environmental Liabilities, Environmental Claims, Environmental Actions and the indemnification obligations contained in this Agreement. At Purchaser's sole discretion such environmental insurance policy may extend to cover Seller and Prior Seller for certain potential liabilities. Seller acknowledges and agrees to cooperate with Purchaser's reasonable requests necessary to procure and bind such an environmental insurance policy. Reasonable requests may include the agreement to and execution of certain environmental insurance policy documents and disclosure of information related to among other things, Environmental Conditions, Environmental Claims, Environmental Actions and Environmental Liabilities.

35.    Notwithstanding any other provision of this contract to the contract to the contrary, Seller shall have the right to pay off any existing mortgages on the premises or to refinance the existing mortgages on the premises or take out a new mortgage or mortgages on the premises, provided that the refinance shall not be amount that would require a payoff, including any exit fees or prepayment penalties, greater than the amount of the balance of the Purchase Price pursuant to the Contract. In the event of any refinance or new mortgage(s) Seller shall disclose the existence of this contract to the lender(s) and shall be permitted to pledge this contract as security for such financing.

[SIGNATURE PAGE FOLLOWS]

SELLER:
DuPont Street Developers LLC

BY:_____
Clay Riverview LLC Bo Jin Zhu Authorized Signatory

PURCHASERS:
DuPont Realty NY LLC

By_____
     Name:                Title:

Guarantor: Solely with respect to Section 13 of the Rider

_____


Escrow Agent:
Madison Title Agency LLC


_____

By:

AMENDMENT TO CONTRACT OF SALE BY AND BETWEEN DuPONT STREET DEVELOPERS LLC, AS SELLER, AND DuPONT REALTY NY LLC, AS PURCHASER, COVERING PREMISES: 280 Franklin Street, 10, 14, 22, 26,30 & 32 Clay Street, 55, 57 & 93 DuPont Street, Brooklyn, NY

In consideration of $10 and other good and valuable consideration paid by DuPont Street Developers LLC to DuPont Realty NY LLC, receipt of which is hereby acknowledged, it is AGREED:

That the certain contract of sale dated the 30th day of March, 2018 between DuPont Street Developers LLC, care of J Developments, 87-10 Queens Boulevard, Elmhurst, NY 11373, as Seller, and DuPont Realty NY LLC, 199 Lee Avenue, PO Box 693, Brooklyn, NY 11211, as Purchaser, for premises described as 280 Franklin Street, 10, 14, 22, 26, 30 & 32 Clay Street, 55, 57 & 93 DuPont Street, Brooklyn New York (the Contract") is hereby  AMENDED as follows:

     1.    Schedule C, PURCHASE PRICE, of the Contract of Sale is amended by increasing the amount in subsection (b) from $52,000,000.00 to $54,125,000.00 and the total Purchase Price contained in Schedule C is increased from $55,000,000.00 to $57,125,000.00.

     2.    Schedule D, MISCELLANEOUS, of the Contract of Sale is amended by changing Subsection 7, Scheduled time and date of closing from "Date: 120 days from execution and delivery of contract, 2018 Time 10:00 AM o'clock" to On or about January 6, 2020.

     3. In the event that Purchaser is ready willing and able to close and Seller fails to close (other than as a result of Seller's inability to convey clean title solely as a result of Notices of Pendency in Actions filed 5/14/2018, in Supreme Court of Kings County; Chain Miller a/k/a/ Harry Miller and 49 Dupont Loft LLC, Plaintiff, v. Joseph Brunner and others, Defendants, under Index No. 509929/2018, and 03/22/2019, in Supreme Court of Kings County; Chain Miller a/k/a/ Harry Miller and 49 Dupont Loft LLC, Plaintiff, v. Dupont Street Developers LLC and others, Defendants, under Index No. 506312/2019, to foreclose an equitable vendee lien) the increased purchase-price created by this Amendment shall be null and void and the Purchase Price of the Contract shall govern.

     4.    Seller acknowledges and agrees that Purchaser has not waived any of its rights to receive insurable title to the Premises pursuant to the Contract.

     5.    Nothing in this Amendment shall be deemed to prohibit Seller or its sole member from filing any action in Bankruptcy Court.  However, in the event of any such filing, this Amendment shall be cancelled and the original terms of the Contract shall be controlling.

6.      All other terms and conditions contained in the aforesaid Contract of Sale shall remain in full force and effect.

7.      Facsimile signatures and signatures in counterparts shall have the same force and effect herein as original signatures to this AMENDMENT.

This AMENDMENT is dated as of November 22, 2019.

| SELLER:<br>DuPont Street Developers LLC | PURCHASERS:<br>DuPont Realty NY LLC |
|---|---|
| <br><br>BY:_____<br><br>Clay Riverview LLC, Bo Jin Zhu<br>Authorized Signatory | BY: _____<br>    Name: Yoel Goldman<br>    Title:  Ceo<br><br><br>By: _____ |