# EXHIBIT A

Execution Version

# PURCHASE AND SALE AGREEMENT

between

## 49 DUPONT REALTY CORP.,
a New York corporation,

### as SELLER,

and

## DUPONT STREET DEVELOPERS LLC
a New York limited liability company,

### as PURCHASER.

**June 8, 2012**

**Premises:**    **49 Dupont Street**
**Brooklyn, New York**
**Kings County**
**Block 2487**
**Lots 1, 10, 12, 17, 18, 20, 21, 57, 72 & 78**

# TABLE OF CONTENTS

Page No.

1.    DEFINITIONS...................................................................................................1
2.    PURCHASE AND SALE. ..................................................................................3
4.    PURCHASE PRICE AND DEPOSIT. ..............................................................4
5.    STATUS OF TITLE. ........................................................................................8
6.    TITLE INSURANCE; LIENS. ..........................................................................9
7.    APPORTIONMENTS.......................................................................................11
8.    PROPERTY NOT INCLUDED IN SALE. ......................................................13
9.    COVENANTS OF SELLER.............................................................................14
10.   CONDITIONS TO CLOSING. ........................................................................14
11.   CONDITION OF THE PROPERTY; REPRESENTATIONS...........................15
12.   DAMAGE AND DESTRUCTION....................................................................22
13.   CONDEMNATION...........................................................................................23
14.   BROKERS AND ADVISORS. .........................................................................23
15.   TAX REDUCTION PROCEEDINGS...............................................................24
16.   TRANSFER TAXES AND TRANSACTION COSTS.......................................24
17.   DELIVERIES TO BE MADE ON THE CLOSING DATE..............................25
18.   CLOSING DATE..............................................................................................26
19.   NOTICES. ........................................................................................................27
20.   DEFAULT BY PURCHASER OR SELLER. ...................................................28
21.   FIRPTA COMPLIANCE...................................................................................29
22.   ENTIRE AGREEMENT....................................................................................29
23.   AMENDMENTS. ..............................................................................................29
24.   WAIVER...........................................................................................................29
25.   PARTIAL INVALIDITY. .................................................................................29
26.   SECTION HEADINGS.....................................................................................30
27.   GOVERNING LAW..........................................................................................30
28.   PARTIES; ASSIGNMENT AND RECORDING. .............................................30
29.   FURTHER ASSURANCES. .............................................................................31
30.   THIRD PARTY BENEFICIARY......................................................................31
31.   JURISDICTION AND SERVICE OF PROCESS.............................................31
32.   WAIVER OF TRIAL BY JURY. .....................................................................31
33.   MISCELLANEOUS. ........................................................................................32
34.   REPRESENTATIONS UPDATE......................................................................32
35.   EXCULPATION...............................................................................................33
36.   TAX DEFERRED EXCHANGE.......................................................................33
37.   CONFIDENTIALITY........................................................................................34
38.   POST-CLOSING ENVIRONMENTAL REMEDIATION................................34

Schedules

A.  Description of the Land
B.  Excluded Personalty
C.  Schedule of Litigation
D.  Environmental Reports

Exhibits

1.  Escrow Agent's Wire Instructions
2.  Form of Deed
3.  Form of FIRPTA Affidavit
4.  Form of Omnibus Assignment and Assumption Agreement

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") made as of the 8th day of June, 2012 (the "**Effective Date**") by and between **49 DUPONT REALTY CORP.**, a New York corporation ("**Seller**"), having an office P.O. Box 786, Deer Park, New York 11729, and **DUPONT STREET DEVELOPERS LLC**, a New York limited liability company ("**Purchaser**"), having an address at c/o Fink & Zelmanovitz, P.C., 3839 Flatlands Avenue, Suite 206, Brooklyn, New York 11234.

## WITNESSETH:

**WHEREAS**, Seller is the owner and holder of the fee simple estate in and to that certain plot, piece and parcel of land (the "**Land**") known as 49 Dupont Street, Brooklyn, New York and more particularly described in Schedule A annexed hereto and made a part hereof, together with the building and all other improvements (collectively, the "**Building**") located on the Land (the Building and the Land being sometimes referred to hereinafter, collectively, as the "**Premises**");

**WHEREAS**, Seller desires to sell the Property (as hereinafter defined) to Purchaser, and Purchaser desires to purchase the Property from Seller, upon and subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions hereinafter set forth and other good and valuable consideration the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.  DEFINITIONS

| | |
|---|---|
| Adjourned Closing Date | Section 6(a)(iii) |
| Agreement | Preamble |
| Anti-Money Laundering Laws | Section 11(e)(vii) |
| Apportionment Date | Section 7(a) |
| Asbestos | Section 11(f) |
| Broker | Section 14(a) |
| Building | Recitals |
| business day | Section 4(d) |
| Closing | Section 18 |
| Closing Date | Section 18 |
| Closing Statement | Section 7(h) |
| Commitment Objections | Section 6(a) |
| Condemnation Election Date | Section 13(a) |
| Cure Extension Notice | Section 11(c) |
| Damages | Section 11(c) |
| Default Rate | Section 7(e) |
| Deposit | Section 4(a)(i) |
| Diligence Party | Section 11(c) |
| Diligence Reports | Section 11(c) |
| Effective Date | Preamble |
| Environmental Laws | Section 11(f) |
| ERISA | Section 11(e)(v) |

| | |
|---|---|
| Escrow Agent | Section 4(a)(i) |
| Excluded Personalty | Section 8 |
| Financial Institution | Section 11(e)(vi) |
| FIRPTA | Section 21 |
| Hazardous Materials | Section 11(f) |
| Inspection Period | Section 3(c) |
| Kalmon Dolgin | Section 14 |
| LC | Section 38(c) |
| Land | Recitals |
| Lender's Counsel | Section 33(c) |
| Limitation Period | Section 11(c) |
| New Closing Notice | Section 6(c) |
| Notices | Section 19 |
| Non-Objectionable Encumbrances | Section 6(a)(iii) |
| OFAC | Section 11(e)(vi) |
| Patriot Act | Section 11(e)(vii) |
| PCBs | Section 11(f) |
| Permitted Encumbrances | Section 5 |
| Person | Section 11(e)(vi) |
| Personalty | Section 2(a) |
| Premises | Recitals |
| Proceeding | Section 11(c) |
| Property | Section 2(a) |
| Property Taxes | Section 7(a)(i) |
| Purchase Price | Section 4 |
| Purchaser | Preamble |
| Purchaser Party | Section 11(e)(vi) |
| Purchaser 1031 Exchange | Section 36(b) |
| Qualification | Section 34 |
| QI | Section 36(a) |
| Report | Section 6(a) |
| Representation | Section 11(c) |
| Scheduled Closing Date | Section 18 |
| Seller | Preamble |
| Seller 1031 Exchange | Section 36(a) |
| Seller Parties | Section 11(a) |
| Seller Knowledge Individual | Section 11(c) |
| Specially Designated Nationals and Blocked Persons | Section 11(e)(vi) |
| Survey | Section 5(a) |
| Taking | Section 13(a) |
| Tax Certiorari Proceeding | Section 15 |
| Termination Date | Section 3(c) |
| Termination Notice | Section 3c0 |
| Title Company | Section 6(a) |
| Title Cure Period | Section 6(a)(iii) |
| Title Notice Date | Section 6(a)(i) |

Title Objections                    Section 6(a)(ii)
Transfer Taxes                      Section 16(a)
Transfer Tax Laws                   Section 16(a)
Update Exception                    Section 6(a)(ii)
Update Objection Deadline           Section 6(a)(ii)
Update Objections                   Section 6(a)(ii)
U.S. Person                         Section 11(e)(vi)
Utilities                           Section 7(c)
Violations                          Section 6(f)

### 2.    PURCHASE AND SALE.

(a)    Seller shall sell, assign and convey to Purchaser, and Purchaser shall purchase and assume from Seller, subject to the terms and conditions of this Agreement, (i) the Premises; (ii) all of Seller's right, title and interest in and to any fixtures, furnishings, furniture, equipment, machinery, inventory, appliances, and other personal property owned by Seller, located at the Premises (collectively, the "**Personalty**") (subject to Section 8 hereof); and (iii) all rights and appurtenances of Seller pertaining to the Premises, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way and strips or gores between the Land and abutting properties, to the extent transferable.  The items described in clauses (i), (ii), and (iii) above are sometimes referred to hereinafter, collectively, as the "**Property**."

(b)    The parties hereto acknowledge and agree that the value of the Personalty is de minimis and that no part of the Purchase Price is allocable thereto.

### 3.    DUE DILIGENCE INSPECTIONS; RIGHT TO TERMINATE..

(a)    Right to Inspect.  Purchaser, and Purchaser's agents and representatives, shall have the right, from time to time, prior to the Closing Date or earlier termination of this Agreement, during normal business hours, to enter upon the Property for the purpose of conducting visual inspections of the Property, testing of machinery and equipment, taking of measurements, making of surveys and generally for the reasonable ascertainment of matters relating to the Property; *provided, however*, that Purchaser shall (i) give Seller reasonable prior written notice of the time and place of such entry, in order to permit a representative of Seller to accompany Purchaser; (ii) use best efforts not to interfere with the operations of the Property or any tenant thereof; (iii) restore any damage to the Property or any adjacent property caused by such actions; (iv) indemnify, defend and save Seller and, as the case may be, its partners, trustees, shareholders, directors, officers, employees and agents harmless of and from any and all claims and/or liabilities which Seller and its partners, trustees, shareholders, directors, officers, employees and agents may suffer or be subject by reason of  or in any manner relating to such entry and such activities, including, without limitation, any claims by tenants and/or invitees of the Property; (v) not enter into any tenant's leased Property or communicate with any tenant unless Seller gives Purchaser written consent to do so (which consent can be withheld at Seller's sole option) and Purchaser is accompanied by Seller or Seller's agent in each instance; (vi) prior to entry onto the Property, furnish Seller with a certificate of general liability and property damage insurance maintained by Purchaser with single occurrence coverage of at least $1,000,000.00 (and aggregate coverage of $2,000,000.00) and naming Seller and its property

manager as additional insureds; and (vii) not conduct any environmental investigations or testing other than a standard "Phase I" investigation.

(b)  No Liens Permitted.  Nothing contained in this Agreement shall be deemed or construed in any way as constituting the consent or request of Seller, express or implied by inference or otherwise, to any party for the performance of any labor or the furnishing of any materials to the Property or any part thereof, nor as giving Purchaser any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials that would give rise to the filing of any liens against the Property or any part thereof.  Purchaser agrees to promptly cause the removal of, and indemnify, defend and hold Seller harmless with respect to, any mechanic's or similar lien filed against the Property or any part thereof by any party performing any labor or services at the Property or supplying any materials to the Property at Purchaser's request.

(c)  Purchaser's Right of Termination.  If Purchaser determines that it is not satisfied with the Property and all matters relating thereto as a result of Purchaser's inspection, Purchaser shall have the right to terminate this Agreement, for any reason whatsoever, by giving Seller notice via e-mail to Samson R. Bechhofer, Esq. at sbechhofer@pryorcashman.com (the "**Termination Notice**") at any time prior to 5:00 p.m. Eastern Standard Time on the date which is the eighteenth (18th) day after the Effective Date (the "**Termination Date**").  The period from the date hereof to 5:00 p.m. Eastern Standard Time on the Termination Date is hereinafter referred to as the "**Inspection Period**".  Upon giving the Termination Notice, this Agreement shall immediately terminate (except for the indemnity obligations of Purchaser to Seller under this Agreement which shall survive termination of this Agreement) and the Initial Deposit shall be returned to Purchaser, as Purchaser's sole and exclusive remedy.  Except as may otherwise be expressly provided in this Agreement, Purchaser shall be deemed to have consented to every fact, item and condition relating to the Property (including, without limitation, all encumbrances and other title exceptions contained in the Report and all matters set forth in or illustrated by the Survey) if a Termination Notice is not delivered by Purchaser prior to the expiration of the Inspection Period.  Purchaser's failure to deliver the Termination Notice prior to the expiration of the Inspection Period shall be deemed a waiver of Purchaser's right to terminate this Agreement under this Section 3(c) or by reason of the physical condition of the Property or any other matter whatsoever relating to the Property.

(d)  Survival.  The provisions of this Section 3 shall survive termination of this Agreement and/or the Closing and delivery of the Deed.

4.  PURCHASE PRICE AND DEPOSIT.

(a)  The purchase price to be paid by Purchaser to Seller for the Property (the "**Purchase Price**") is TWENTY MILLION SEVEN HUNDRED FIFTY THOUSAND and 00/100 ($20,750,000.00) DOLLARS, payable as follows:

(i)  Simultaneously with the execution of this Agreement by Purchaser, Purchaser shall deliver to Seller's counsel, Pryor Cashman LLP, as escrow agent (the "**Escrow Agent**"), FIVE HUNDRED THOUSAND and 00/100 ($500,000.00) DOLLARS, by Purchaser's check, subject to collection, or by wire transfer in immediately available federal

funds to the escrow account of Escrow Agent in accordance with the wire instructions set forth in Exhibit 1 annexed hereto and made a part hereof (the "**Initial Deposit**"). The Initial Deposit shall be non-refundable except as expressly provided in Section 3(c) hereof;

(ii)    Provided Purchaser has not exercised its right to terminate this Agreement as provided in Section 3(c) hereof, no later than one (1) business day following the expiration of the Inspection Period (*time being of the essence with respect to such delivery*) Purchaser shall deliver to Seller's counsel **FIVE HUNDRED THOUSAND and 00/100 ($500,000.00)** DOLLARS, by wire transfer in immediately available federal funds to the escrow account of Escrow Agent in accordance with the wire instructions set forth in Exhibit 1 annexed hereto and made a part hereof (the "**Additional Deposit**", the Additional Deposit together with the Initial Deposit, collectively, the "**Deposit**"). The Deposit shall be non-refundable except as expressly provided in Sections 6(b), 13(a)(ii) and 20(b) hereof.

(ii)    **NINETEEN MILLION SEVEN HUNDRED FIFTY THOUSAND and 00/100 ($19,750,000.00)** Dollars at the Closing by wire transfer in immediately available federal funds to Seller or as Seller may otherwise direct on notice given not less than two (2) business days prior to the Closing, pursuant to wiring instructions to be given to Purchaser or its counsel; and

(b)    (i)    Upon receipt by Escrow Agent of the Initial Deposit and the Additional Deposit, Escrow Agent shall cause the same to be deposited into an interest-bearing account at a bank account or accounts in New York City designated by Escrow Agent, it being agreed that Escrow Agent shall not be liable for (y) any loss of such investment (unless due to Escrow Agent's gross negligence or willful misconduct) or (z) any failure to attain a favorable rate of return on such investment. Escrow Agent shall deliver the Deposit, to whichever of the Seller or Purchaser, as the case may be, is entitled to the Deposit under the following conditions:

(A)    The Deposit shall be delivered to Seller at the Closing; or

(B)    The Deposit shall be delivered to Seller following receipt by Escrow Agent of written demand therefor from Seller stating that Purchaser has defaulted in the performance of its obligations under this Agreement and specifying the Section(s) of this Agreement which entitles Seller to the Deposit, provided Purchaser shall not have given written notice of objection in accordance with the provisions set forth below; or

(C)    The Deposit shall be delivered to Purchaser following receipt by Escrow Agent of a demand therefor from Purchaser sent via e-mail to Samson R. Bechhofer, Esq. at sbechhofer@pryorcashman.com stating that Seller has defaulted in the performance of its obligations under this Agreement or that this Agreement was terminated under circumstances entitling Purchaser to the return of the Deposit, and specifying the Section(s) of this Agreement which entitles Purchaser to the return of the Deposit, in each case provided Seller shall not have given written notice of objection in accordance with the provisions set forth below; or

(D)     The Deposit shall be delivered to Purchaser or Seller as directed by joint written instructions of Seller and Purchaser.

(ii)     Upon the filing of a demand for the Deposit by Seller or Purchaser, pursuant to subsection (B) or (C) above, Escrow Agent shall promptly give notice thereof (including a copy of such demand) to the other party.  The other party shall have the right to object to the delivery of the Deposit, by giving notice of such objection to Escrow Agent via e-mail to Samson R. Bechhofer, Esq. at sbechhofer@pryorcashman.com at any time within ten (10) business days after such party's receipt of notice from Escrow Agent, but not thereafter.  Such notice shall set forth the basis (in reasonable detail) for objecting to the delivery of the Deposit.  Upon receipt of such notice of objection, Escrow Agent shall promptly give a copy of such notice to the party who filed the written demand.  If Escrow Agent shall have timely received such notice of objection, Escrow Agent shall continue to hold the Deposit until (x) Escrow Agent receives joint written notice from Seller and Purchaser, or a certified copy of any final judgment entered in any litigation between Seller and Purchaser with respect to the Deposit, directing the disbursement of the Deposit, in which case Escrow Agent shall then disburse the Deposit in accordance with said direction, or (y) litigation is commenced between Seller and Purchaser, in which case Escrow Agent may deposit the Deposit with the clerk of the court in which said litigation is pending, or (z) Escrow Agent takes such affirmative steps as Escrow Agent may reasonably elect, at Escrow Agent's option, in order to terminate Escrow Agent's duties hereunder, including but not limited to depositing the Deposit in court or in escrow with the Title Company on terms reasonably satisfactory to Seller and Purchaser and commencing an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party in such interpleader action, as determined by a final non-appealable order of such court.

(iii)     Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any person or persons purporting to have authority to act on behalf of Seller or Purchaser, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own gross negligence or willful misconduct.  Escrow Agent shall have no duties or responsibilities except those set forth herein.  Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless the same is in writing and signed by Purchaser and Seller and, if Escrow Agent's duties hereunder are affected, unless Escrow Agent shall have given prior written consent thereto.  Escrow Agent shall be reimbursed by Seller and Purchaser for any expenses (including reasonable legal fees and disbursements), including any of Escrow Agent's fees and expenses with respect to any interpleader action incurred in connection with this Agreement, and such liability shall be joint and several; provided, however, that, as between Purchaser and Seller, the prevailing party in any dispute over the Deposit shall be entitled to reimbursement by the losing party of any such expenses paid to Escrow Agent.  In the event that Escrow Agent shall be uncertain as to Escrow Agent's duties or rights hereunder, or shall receive instructions from Purchaser or Seller that, in Escrow Agent's opinion, are in conflict with any of the provisions hereof, Escrow Agent shall be entitled to hold the Deposit and may decline to take any other action.  After delivery of the Deposit in accordance herewith, Escrow Agent shall have no further liability or obligation of any kind whatsoever.

(iv)    Escrow Agent shall have the right at any time to resign upon ten (10) business days' prior notice to Seller and Purchaser.  Seller and Purchaser shall jointly select a successor escrow agent and shall notify Escrow Agent of the name and address of such successor escrow agent within ten (10) business days after receipt of notice from Escrow Agent of its intent to resign.  If Escrow Agent has not received notice of the name and address of such successor escrow agent within such period, Escrow Agent shall have the right to select, on behalf of Seller and Purchaser, a bank or trust company licensed to do business in the State of New York and having a branch located in New York County to act as successor escrow agent hereunder.  At any time after such ten (10) business day period, Escrow Agent shall have the right to deliver the Deposit to such successor escrow agent, provided such successor escrow agent shall execute and deliver to Seller and Purchaser an assumption agreement whereby it assumes all of Escrow Agent's obligations hereunder.  Upon the delivery of all such amounts and such assumption agreement, the successor escrow agent shall become the Escrow Agent for all purposes hereunder and shall have all of the rights and obligations of the Escrow Agent hereunder, and the resigning Escrow Agent shall have no further responsibilities or obligations hereunder.

(v)    Seller and Purchaser each hereby agrees to indemnify, defend and hold harmless Escrow Agent from and against fifty (50%) percent of any and all loss, cost, damage, expense and reasonable attorneys' fees and disbursements actually incurred by Escrow Agent arising out of it acting as the Escrow Agent hereunder, other than to the extent arising from Escrow Agent's gross negligence or willful misconduct.

(vi)    The interest earned on the Deposit shall be paid to the party entitled to receive the Deposit as provided in this Agreement.  Purchaser shall not be entitled to any credit against the Purchase Price with respect to any such interest paid to Seller at Closing.  The party receiving such interest shall pay any income taxes thereon.    Seller's taxpayer identification number is 11-2716399; Purchaser's taxpayer identification number is 45-4281106.

(vii)    The provisions of this Section 4(b) shall survive the Closing or termination of this Agreement.

(c)    All monies payable by Purchaser under this Agreement, unless otherwise specified in this Agreement or directed by Seller, shall be paid by Purchaser causing such monies to be wire transferred in immediately available federal funds at such bank account or accounts designated in writing by Seller, and divided into such amounts designated by Seller as may be required to facilitate the consummation of the transactions contemplated by this Agreement.

(d)    As used in this Agreement, the term "business day" shall mean every day other than Saturdays, Sundays, all days observed by the federal or New York State government as legal holidays and all days on which commercial banks in New York State are required by law to be closed.

(e)    Any reference in this Agreement to a "day" or a number of "days" (other than references to a "business day" or "business days") shall mean a calendar day or calendar days.

5.    <u>STATUS OF TITLE</u>.

Subject to the terms and provisions of this Agreement, Seller's interest in the Premises shall be sold, assigned and conveyed by Seller to Purchaser, and Purchaser shall accept and assume same, subject to the following (collectively, the "**<u>Permitted Encumbrances</u>**"):

(a)    the state of facts disclosed on a survey of the Premises made by Samuel A. McElroy dated September 2, 1983 (the "<u>Survey</u>") and on any update of the Survey provided same do not interfere with the use of the Premises as presently zoned;

(b)    the standard printed exclusions from coverage contained in the ALTA form of owners title policy currently in use in New York, with the standard New York endorsement;

(c)    Party Wall Agreements recorded in the Office of the Register of the City of New York for Kings County in Liber 7416 cp 691 and Liber 8896 cp 513;

(d)    Non-Objectionable Encumbrances; and any liens, encumbrances or other title exceptions approved or expressly waived by Purchaser as provided in this Agreement;

(e)    Property Taxes which are a lien but not yet due and payable, subject to proration in accordance with <u>Section 7</u> hereof;

(f)    any laws, rules, regulations, statutes, ordinances, orders or other legal requirements affecting the Premises, including, without limitation, all zoning, land use, building and environmental laws, rules, regulations, statutes, ordinances, orders or other legal requirements, including landmark designations and all zoning variance and special exceptions, if any;

(g)    any covenants, restrictions and easements, and utility company rights, easements and franchises relating to electricity, water, steam, gas, telephone, sewer or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Premises, provided none of the above are violated by any improvements, or current use of, the Premises (ii) provide for reverter or a right of re-entry or forfeiture in the event of a violation thereof or (ii) contain any restrictions or grant any rights to third parties relating to or which would affect alterations or demolition of any improvements on the Premises;

(h)    any installment not yet due and payable of assessments imposed after the Closing Date and affecting the Premises or any portion thereof, subject to apportionment if required hereunder;

(i)    all Violations now or hereafter issued or noted; <u>provided, however</u>, that Seller shall pay at Closing any and all fines, interest and penalties arising out of any Violation(s) which are levied by any federal, state, municipal or other governmental department, agency or bureau or any other governmental authority having jurisdiction over the Premises;

(j)    consents of record by Seller or any former owner of all or a portion of the

Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut;

(k)    possible immaterial encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under, or above any street or highway, the Premises or any adjoining property; and

(l)    all other matters which, pursuant to the terms of this Agreement, are deemed Permitted Encumbrances.

6.    TITLE INSURANCE; LIENS.

(a)    (i)    Purchaser has ordered a title report (the "**Report**")from Riverside Abstract LLC (the "**Title Company**") with respect to the Property. If the Report discloses any encumbrance, lien or other title exception that is not a Permitted Encumbrance, and which renders title to the Premises uninsurable at regular rates (collectively, the "**Commitment Objections**"), then Purchaser may object to the same by giving written notice (a "**Title Notice**") to Seller not later than 5:00 P.M. EDT on July 8, 2012 (the "**Title Notice Date**"), *time being of the essence*. Purchaser shall have no right to object to any exceptions or other matters disclosed in the Report or the Survey except for items which render the Property uninsurable and are not otherwise Permitted Encumbrances. If Purchaser fails to give a Title Notice by the Title Notice Date, any lien, encumbrance or other title exception existing as of the Title Notice Date shall be deemed a Permitted Encumbrance hereunder.

(ii)    If, after the Title Notice Date and prior to the Closing Date, the Title Company shall deliver any update to any of the exhibits and schedules making up the Report which discloses additional liens, encumbrances or other title exceptions (i) which were not disclosed by the Report, (ii) which do not otherwise constitute Permitted Encumbrances hereunder, and (iii) which prohibit or impair to any material extent the intended development of the Premises by Purchaser (any such additional lien, encumbrance or other title exception meeting all of such qualifications, each being an "**Update Exception**"), delivery of such update to Seller shall constitute Purchaser's notice to Seller of Purchaser's objection to the Update Exception(s) contained therein (the "**Update Objections**"; the Update Objections and Commitment Objections are, collectively, the "**Title Objections**").

(iii)    Purchaser shall not be entitled to object to, and shall be deemed to have approved, any liens, encumbrances or other title exceptions (and the same shall not constitute Title Objections, but shall instead be deemed to be Permitted Encumbrances) (A) over which the Title Company is willing to insure at regular rates (without additional cost, charge or premium to Purchaser or where Seller pays such cost, charge or premium for Purchaser), (B) against which the Title Company is willing to provide affirmative insurance (without additional cost, charge or premium to Purchaser or where Seller pays such cost, charge or premium for Purchaser), (C) which will be extinguished and removed as an exception on the Report upon the transfer of the Property from Seller to Purchaser, or (D) in the event the title company selected

by Purchaser is not Commonwealth Land Title Insurance Company ("**CLTIC**"), which CLTIC is willing to omit or affirmatively insure over the same as an exception to a title insurance policy issued by CLTIC, whether such removal or insurance is the result of payment, bonding, indemnity of Seller or otherwise (collectively, the "**Non-Objectionable Encumbrances**"). Notwithstanding anything to the contrary contained herein, if Seller is unable to eliminate the Title Objections by the Scheduled Closing Date, unless the same are expressly waived by Purchaser without any abatement in the Purchase Price, Seller may, adjourn the Scheduled Closing Date (such date to which Seller adjourns the Scheduled Closing Date is the "**Adjourned Closing Date**"), for a period not to exceed the ninetieth (90th) day following the Scheduled Closing Date (the "**Title Cure Period**"), in order to attempt to eliminate such exceptions.

(b)     If Seller is unable to eliminate any Title Objection within the Title Cure Period, then, unless the same is expressly waived by Purchaser, Purchaser may (i) accept the Property subject to such Title Objection without abatement of the Purchase Price, in which event (x) such Title Objection shall be deemed to be, for all purposes, a Permitted Encumbrance, (y) Purchaser shall close hereunder notwithstanding the existence of same, and (z) Seller shall have no obligations whatsoever after the Closing Date with respect to Seller's failure to cause such Title Objection to be eliminated, or (ii) terminate this Agreement by notice given to Escrow Agent via e-mail to Samson R. Bechhofer, Esq. at sbechhofer@pryorcashman.com within ten (10) business days following expiration of the Title Cure Period, time being of the essence, in which event Purchaser shall be entitled to a return of the Deposit. If Purchaser shall fail to deliver the termination notice described in clause (ii) of this paragraph within the ten (10) business day period described therein, time being of the essence, Purchaser shall be deemed to have made the election under clause (i). Upon the timely giving of any termination notice under clause (ii), this Agreement shall terminate and neither party hereto shall have any further rights or obligations hereunder other than those which are expressly provided to survive the termination hereof except that the Deposit shall be returned to Purchaser.

(c)     It is expressly understood that in no event shall Seller be required to bring any action or institute any proceeding, or to otherwise incur any costs or expenses, in order to attempt to eliminate any Title Objections, or take any other actions to cure or remove any Title Objections, or to otherwise cause title to be in accordance with the terms of this Agreement on the Closing Date. Notwithstanding anything in this Section 6 to the contrary, Seller shall be required to remove, by payment, bonding or otherwise: (i) any Title Objections which have been voluntarily recorded or created by, or with the written consent of, Seller or are otherwise placed by Seller against the Property on or following the Effective Date (e.g., voluntary easements, voluntary judgments) and which are not given for the benefit of any utility or governmental authority, or (ii) any Title Objections which would not fall within the definition of (i) above and which can be removed by the payment of a liquidated sum of money; provided, however, that with respect to such items set forth in this clause (ii), in no event shall Seller be obligated to expend amounts in excess of $100,000.00 in the aggregate pursuant to the provisions of this sentence. Notwithstanding the foregoing, Seller shall be required to satisfy, discharge or remove of record any instrument in the nature of a mortgage, security agreement, financing statement or any other instrument which evidences or secures voluntary indebtedness entered into or placed on the Premises by Seller.

(d)     If Seller shall have adjourned the Scheduled Closing Date in order to cure

Title Objections in accordance with the provisions of this <u>Section 6</u>, Seller shall, upon the satisfactory cure thereof, promptly reschedule the Scheduled Closing Date, upon no less than five (5) business days' prior notice to Purchaser (the "**New Closing Notice**"); it being agreed, however, that if any Title Objections arise between the date the New Closing Notice is given and the Adjourned Closing Date, Seller may again adjourn the Closing for a reasonable period or periods, in order to attempt to cause such exceptions to be eliminated; provided, however, that Seller shall not be entitled to adjourn the Adjourned Closing Date pursuant to this <u>Section 6</u> for a period or periods in excess of sixty (60) days in the aggregate beyond the Scheduled Closing Date.

(e)     If the Report discloses judgments, bankruptcies or other returns against other persons having names the same as or similar to that of any entity making up Seller, on request, Seller shall deliver to the Title Company affidavits showing that such judgments, bankruptcies or other returns are not against any entity making up Seller in order to request the Title Company to omit exceptions with respect to such judgments, bankruptcies or other returns or to insure over same.

(f)     Purchaser agrees to purchase the Premises subject to any and all notes or notices of violations of law, or municipal ordinances, orders, designations or requirements whatsoever noted in or issued by any federal, state, municipal or other governmental department, agency or bureau or any other governmental authority having jurisdiction over the Premises (individually, a "**Violation**" and collectively, "**Violations**"), or any condition or state of repair or disrepair or other matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Premises.  Seller shall have no duty to remove or comply with or repair (i) any condition, matter or thing whether or not noted, which, if noted, would result in a Violation being placed on the Premises, or (ii) any of the aforementioned Violations, or other conditions, and Purchaser shall accept the Premises subject to all such Violations, the existence of any conditions affecting the Premises which would give rise to such Violations, if any, and any governmental claims arising from the existence of such Violations, in each case without any abatement of or credit against the Purchase Price; provided, however, that Seller shall pay at Closing any and all fines, interest and penalties arising out of any Violation(s) which are levied by any federal, state, municipal or other governmental department, agency or bureau or any other governmental authority having jurisdiction over the Premises.

(g)     Notwithstanding anything to the contrary contained in this Agreement, the fact that the Premises does not have the proper certificates or permits (or, if there be such certificate(s) or permit(s), that there exist any variances between such certificate(s) or permit(s) and the actual state or use(s) or condition(s) of the Premises) shall not be deemed to be an objection to title nor any other grounds for the Purchaser to not perform as required under this Agreement.

7.     <u>APPORTIONMENTS.</u>

(a)     The following shall be apportioned between Seller and Purchaser as of 11:59 p.m. on the day immediately preceding the Closing Date (the "**Apportionment Date**") on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month and a 365 day year and the net

amount thereof shall be added to or subtracted from, as the case may be, the cash balance of the Purchase Price to be paid to Seller at the Closing:

(i)    real estate taxes, sewer rents and taxes, water rates and charges (to the extent not accounted for pursuant to clause (i) above), vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Premises (collectively, "**Property Taxes**"), on the basis of the respective periods for which each is assessed or imposed, to be apportioned in accordance with Section 7(b) hereof;

(ii)    fuel, if any, as estimated by Seller's supplier, at current cost, together with any sales taxes payable in connection therewith, if any (a letter from Seller's fuel supplier shall be conclusive evidence as to the quantity of fuel on hand and the current cost therefor); and

(iii)    such other items as are customarily apportioned in real estate closings of commercial properties in the City of New York, State of New York.

(b)    Property Taxes shall be apportioned on the basis of the fiscal period for which assessed. If the Closing Date shall occur before an assessment is made or a tax rate is fixed for the tax period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the tax rate for the preceding year to the latest assessed valuation, but, promptly after the assessment and/or tax rate for the current year are fixed, the apportionment thereof shall be recalculated and Seller or Purchaser, as the case may be, shall make an appropriate payment to the other within five (5) business days based on such recalculation. If as of the Closing Date the Premises or any portion thereof shall be affected by any special or general assessments which are or may become payable in installments of which the first installment is then a lien and has become payable, Seller shall pay the unpaid installments of such assessments which are due prior to the Closing Date and Purchaser shall pay the installments which are due on or after the Closing Date.

(c)    If there are water meters at the Premises, the unfixed water rates and charges and sewer rents and taxes covered by meters, if any, shall be apportioned (i) on the basis of an actual reading done within thirty (30) days prior to the Apportionment Date, or (ii) if such reading has not been made, on the basis of the last available reading. If the apportionment is not based on an actual current reading, Seller shall deposit with the Escrow Agent an amount equal to two (2) times the amount of the last actual reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) business days following notice of the determination of such actual reading, readjust such apportionment and Escrow Agent shall deliver to Purchaser the amount determined to be due upon such readjustment. If the Premises has not been metered to measure water consumption, then Seller shall pay any surcharge issued by the City of New York, and no adjustment shall be made for same. If the property has no such water meter, has not been registered to "monitor meter" and a surcharge has not been issued by the City of New York prior to closing, then at closing Seller shall deposit with the Escrow Agent an escrow equal to two (2) times the last frontage charge assessed by the City of New York, to pay for any surcharge issued after closing. Such escrow shall be held by the Escrow Agent for a period of one year (unless released within the year to pay any surcharge submitted to the Escrow Agent for

payment).

(d)     Charges for all electricity, steam, gas and other utility services (collectively, "**Utilities**") shall be billed to Seller's account up to the Apportionment Date and, from and after the Apportionment Date, all Utilities shall be billed to Purchaser's account. If for any reason such changeover in billing is not practicable as of the Closing Date as to any Utility, such Utility shall be apportioned on the basis of actual current readings or, if such readings have not been made, on the basis of the most recent bills that are available. If any apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) business days following notice of the determination of such actual reading, readjust such apportionment and Seller shall promptly deliver to Purchaser, or Purchaser shall promptly deliver to Seller, as the case may be, the amount determined to be due upon such adjustment.

(e)     At or prior to the Closing, Seller and Purchaser and/or their respective agents or designees will jointly prepare and approve a closing statement (the "**Closing Statement**") which will show the net amount due either to Seller or to Purchaser as the result of the adjustments and prorations provided for in this Agreement, and such net due amount will be added to or subtracted (as a credit to Purchaser) from the cash balance of the Purchase Price to be paid to Seller at the Closing pursuant to Section 4 hereof, as applicable. Prior to and following the Closing Date, each party shall provide the other with such information as the other shall reasonably request (including, without limitation, access to the books, records, files, ledgers, information and data with respect to the Property during normal business hours upon reasonable advance notice) in order to make the adjustments and prorations provided for herein. The adjustments, prorations and determinations agreed to by Seller and Purchaser in the Closing Statement shall be conclusive and binding on the parties hereto except for any items which are not capable of being determined at the time the Closing Statement is agreed to by Seller and Purchaser, which items shall be determined within sixty (60) after the Closing and paid in the manner set forth in the Closing Statement, and except for other amounts payable hereunder pursuant to provisions which survive the Closing and except for manifest error.

(f)     If any payment to be made after Closing under this Section 7 shall not be paid when due hereunder, the same shall bear interest (which shall be paid together with the applicable payment hereunder) from the date due until so paid at a rate per annum equal to the Prime Rate (as such rate may vary from time to time) as reported in *The Wall Street Journal* plus 5% (the "**Default Rate**"). To the extent a payment provision in this Section 7 does not specify a period for payment, then for purposes hereof such payment shall be due within ten (10) business days of the date such payment obligation is triggered.

(g)     The provisions of this Section 7 shall survive the Closing.

8.     PROPERTY NOT INCLUDED IN SALE.

Notwithstanding anything to the contrary contained herein, it is expressly agreed by the parties hereto that Seller shall, prior to Closing, remove the fixtures, furniture, furnishings, equipment and/or other personal property at the Premises that are identified on Schedule B attached hereto and made a part hereof (collectively, "**Excluded Personalty**"). The Excluded

Personalty shall not be included in the Property to be sold to Purchaser hereunder, and Seller shall not be liable for any damage to the Property caused by such removal.

9.    COVENANTS OF SELLER.

(a)    During the period from the Effective Date until the Closing Date, Seller shall maintain, or cause to be maintained, in full force and effect the insurance policies currently in effect with respect to the Premises (or replacements continuing similar coverage to the extent commercially available).

(b)    During the period from the Effective Date until the Closing Date, Seller shall not, to the extent the same would be binding on or affect the Premises or any owner thereof after the Closing:

(i)    enter in any lease or other occupancy agreement for the Premises or any part thereof which would be binding upon Purchaser on or after the Closing Date; or

(ii)    affirmatively subject the Premises to any additional liens, encumbrances, covenants or easements, which would not constitute Permitted Encumbrances, which would be in effect after the Closing.

10.    CONDITIONS TO CLOSING.

(a)    Conditions to Obligations of Seller.  The obligation of Seller to effect the Closing shall be subject to the fulfillment (or written waiver by Seller) at or prior to the Closing Date of the following conditions:

(i)    Representations and Warranties.    The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date.

(ii)    Performance of Obligations.  Purchaser shall have paid the full balance of the Purchase Price, as the same may be adjusted in accordance with the terms of this Agreement, executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Purchaser hereunder on the Closing Date; and in all material respects performed after notice from Seller and the expiration of a reasonable period without cure, all other obligations required to be performed by Purchaser under this Agreement on or prior to the Closing Date.

(b)    Conditions to Obligations of Purchaser.  The obligations of Purchaser to effect the Closing shall be subject to the fulfillment (or written waiver by Purchaser) at or prior to the Closing Date of the following conditions:

(i)    Representations and Warranties.    The representations and warranties of Seller contained in Section 11(c)(i) and (vi) hereof shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date.  Section 34 hereof shall govern the conditions precedent relating to the remaining representations and warranties contained in Section 11(c) hereof.

14

(ii)    Performance of Obligations.    Seller shall have executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Seller hereunder on the Closing Date and Seller shall in all material respects have performed all other obligations required to be performed by Seller under this Agreement on or prior to the Closing Date.

(c)    Failure of Condition.    If Purchaser is unable to timely satisfy (and Seller has not waived in writing) the conditions precedent to Seller's obligation to effect the Closing, then such failure shall constitute a default by Purchaser hereunder, in which case Section 20(a) hereof shall govern. If Seller fails or is unable to timely satisfy the conditions precedent to Purchaser's obligation to effect the Closing then, (i) Seller may, if it so elects and without any abatement in the Purchase Price, adjourn the Scheduled Closing Date for a period or periods not to exceed forty-five (45) days in the aggregate and (ii) if, after any such extension, the conditions precedent to Purchaser's obligation to effect the Closing continue not to be satisfied (and Purchaser has not waived the same) or Seller does not elect such extension and, in either case, such failure of condition precedent is not the result of Purchaser's willful breach of the covenants set forth in this Agreement, then Purchaser shall be entitled to terminate this Agreement by notice thereof to Seller. If this Agreement is so terminated, then Purchaser shall be entitled to receive the Deposit and neither party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof. If the provisions of clause (ii) above of this Section 10(e) would be applicable, except such failure of condition precedent is the result of Seller's willful default hereunder, then Section 20(b) hereof shall govern.

11.    CONDITION OF THE PROPERTY; REPRESENTATIONS.

(a)    PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY OF SELLER'S SHAREHOLDERS, OFFICERS, DIRECTORS, TRUSTEES, PARTNERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, AFFILIATES, REPRESENTATIVES, CONSULTANTS, ACCOUNTANTS, CONTRACTORS AND ATTORNEYS OR OTHER ADVISORS, DISCLOSED OR UNDISCLOSED, DIRECT AND INDIRECT, AND ANY SUCCESSORS OR ASSIGNS OF THE FOREGOING (COLLECTIVELY WITH SELLER, "**SELLER PARTIES**"), NOR ANY OTHER PERSON ACTING ON BEHALF OF SELLER, NOR ANY PERSON OR ENTITY WHICH PREPARED OR PROVIDED ANY OF THE MATERIALS REVIEWED BY PURCHASER IN CONDUCTING ITS DUE DILIGENCE, NOR ANY SUCCESSOR OR ASSIGN OF ANY OF THE FOREGOING PARTIES, HAS MADE OR SHALL BE DEEMED TO HAVE MADE ANY ORAL OR WRITTEN REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESSED OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE (INCLUDING, WITHOUT LIMITATION, WARRANTIES OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PROPERTY, THE PERMITTED USE OF THE PROPERTY OR THE ZONING AND OTHER LAWS, REGULATIONS AND RULES APPLICABLE THERETO OR THE COMPLIANCE BY THE PROPERTY THEREWITH, THE REVENUES AND EXPENSES GENERATED BY OR ASSOCIATED WITH THE PROPERTY, OR OTHERWISE RELATING TO THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED HEREIN. PURCHASER HAS INVESTIGATED, OR HAS WAIVED INVESTIGATION OF, THE PROPERTY AND THE CIRCUMSTANCES

AND CONDITIONS AFFECTING THE PROPERTY TO ITS FULL SATISFACTION. PURCHASER EXPRESSLY REPRESENTS, WARRANTS AND COVENANTS THAT IT (A) HAS ENGAGED, OR HAS WAIVED THE ENGAGEMENT OF, COUNSEL FOR ADVICE REGARDING PERTINENT ENACTED AND PROPOSED LAWS, ORDINANCES AND REGULATIONS AND ADMINISTRATIVE ORDERS RELATING IN ANY WAY TO THE PROPERTY, (B) HAS CONDUCTED, OR HAS WAIVED CONDUCTING, SUCH EXAMINATIONS AND INVESTIGATIONS OF THE TITLE, ZONING, HISTORY AND CONDITION OF THE PROPERTY, AND (C) HAS INSPECTED AND INVESTIGATED, OR HAS WAIVED INSPECTION AND INVESTIGATION OF, THE PROPERTY TO THE EXTENT PURCHASER DEEMS NECESSARY TO UNDERSTAND THE CONDITION, INCLUDING THE ENVIRONMENTAL STATUS AND CONDITION, OF THE PROPERTY, INCLUDING THE ACTIVITIES CONDUCTED THEREON OR THEREIN NOW AND IN THE PAST, AS PURCHASER MAY HAVE DESIRED.   PURCHASER FURTHER ACKNOWLEDGES THAT ALL MATERIALS WHICH HAVE BEEN PROVIDED BY ANY OF THE SELLER PARTIES HAVE BEEN PROVIDED WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THEIR CONTENT, SUITABILITY FOR ANY PURPOSE, ACCURACY, TRUTHFULNESS OR COMPLETENESS, AND PURCHASER SHALL NOT HAVE ANY RECOURSE AGAINST SELLER OR ANY OF THE OTHER SELLER PARTIES IN THE EVENT OF ANY ERRORS THEREIN OR OMISSIONS THEREFROM.  PURCHASER IS ACQUIRING THE PROPERTY BASED SOLELY ON ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION PROVIDED BY SELLER OR ANY OF THE OTHER SELLER PARTIES, EXCEPT FOR THE REPRESENTATIONS (AS HEREINAFTER DEFINED) EXPRESSLY SET FORTH HEREIN.  PURCHASER EXPRESSLY DISCLAIMS ANY INTENT TO RELY ON ANY SUCH MATERIALS PROVIDED TO IT BY SELLER IN CONNECTION WITH ITS DUE DILIGENCE AND AGREES THAT IT SHALL RELY SOLELY ON ITS OWN INDEPENDENTLY DEVELOPED OR VERIFIED INFORMATION. THE ACCEPTANCE OF THE DEED BY PURCHASER SHALL BE DEEMED TO BE A FULL PERFORMANCE AND DISCHARGE OF EVERY AGREEMENT AND OBLIGATION ON THE PART OF SELLER HEREUNDER AND NO REPRESENTATION, WARRANTY OR AGREEMENT, EXPRESS OR IMPLIED, OF SELLER SHALL SURVIVE THE CLOSING EXCEPT THOSE, IF ANY, WHICH ARE HEREIN SPECIFICALLY STATED TO SURVIVE THE CLOSING.

      (b)     EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, PURCHASER HAS AGREED TO ACCEPT POSSESSION OF THE PROPERTY ON THE CLOSING DATE, SUBJECT TO THE PROVISIONS OF SECTIONS 12 AND 13 HEREOF, LOSS BY CONDEMNATION OR FIRE OR OTHER CASUALTY EXCEPTED, ON AN "AS IS" AND "WITH ALL FAULTS" BASIS WITH NO RIGHT OF SET-OFF OR REDUCTION IN THE PURCHASE PRICE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN SUCH SALE SHALL BE WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, (INCLUDING, WITHOUT LIMITATION, WARRANTY OF INCOME POTENTIAL, OPERATING EXPENSES, USES, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND SELLER DOES HEREBY DISCLAIM AND RENOUNCE ANY SUCH REPRESENTATION OR WARRANTY. PURCHASER DOES HEREBY FURTHER ACKNOWLEDGE AND AGREE THAT SELLER SHALL NOT BE DEEMED TO HAVE MADE OR BE BOUND BY ANY

REPRESENTATION OR WARRANTY BY ANY PERSON WITH RESPECT TO THE PROPERTY NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. PURCHASER ACKNOWLEDGES AND AGREES THAT ITS OBLIGATIONS UNDER THIS AGREEMENT SHALL NOT BE SUBJECT TO ANY FINANCING CONTINGENCY OR OTHER CONTINGENCIES OR SATISFACTION OF CONDITIONS, AND PURCHASER SHALL HAVE NO RIGHT TO TERMINATE THIS AGREEMENT OR RECEIVE A RETURN OF THE DEPOSIT EXCEPT AS EXPRESSLY PROVIDED FOR IN <u>SECTIONS 6(b)</u>, <u>13(a)(ii)</u> AND <u>20(b)</u> HEREOF.

    (c)    As of the Effective Date and, pursuant to <u>Section 34</u> hereof, as of the Closing Date, Seller hereby represents and warrants to Purchaser as follows (each a "**Representation**" and collectively, the "**Representations**"):

    (i)    Seller has full power and authority to enter into and perform this Agreement in accordance with its terms. This Agreement and all documents executed by Seller which are to be delivered to Purchaser at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Seller, and at the time of Closing will be the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, and do not and, at the time of Closing will not, (i) violate or conflict with any provision of any agreement, contract, instrument or obligation to which Seller or the Property is subject, (ii) violate or conflict with any judgment, decree or order of any court applicable to or affecting Seller or (iii) violate or conflict with any law or governmental regulation or permit applicable to Seller.

    (ii)    Seller is a New York corporation that was duly formed and is validly existing under the laws of the State of New York.

    (iii)    Seller is the fee owner of the Property.

    (iv)    Except as set forth on <u>Schedule C</u> annexed hereto, there is no action, suit, litigation, hearing or administrative proceeding pending as of the Effective Date against Seller or the Premises in any court or before any arbitrator of any kind or before any governmental body as to which Seller has received written notice, or, to Seller's Actual Knowledge, threatened with respect to all or any portion of the Premises.

    (v)    There are no condemnation or eminent domain proceedings pending as to which Seller has received written notice or, to Seller's Actual Knowledge, threatened against the Premises or any part thereof.

    (vi)    At the time of the Closing (A) there will be no employees of Seller employed at the Premises, (B) the Premises shall be free of tenants or other occupants, and (C) there shall be no service contracts in effect for the Premises that shall be binding upon Purchaser.

    (vii)    As of the Effective Date, Seller has not (A) made a general assignment for the benefit of creditors, (B) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors that remains pending, (C) suffered the appointment of a receiver to take possession of all, or substantially all, of Seller's assets that remains pending, (D) suffered the attachment or other judicial seizure of all, or substantially all,

of Seller's assets that remains pending, (E) admitted in writing its inability to pay its debts as they come due, or (F) made an offer of settlement, extension or composition to its creditors generally.

(viii)    Seller is not now nor shall it be at any time prior to or at the Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "**Person**") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "**U.S. Person**"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC, such Persons, "**Specially Designated Nationals and Blocked Persons**") or otherwise. Neither Seller nor any Person who owns an interest in Seller now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("**Financial Institution**"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

(ix)    There are no leases, occupancy agreements or service contracts in effect with respect to the Premises.

Any and all uses of the phrase, "to Seller's Actual Knowledge" or other references to Seller's knowledge in this Agreement, shall mean the actual, present, conscious knowledge of Joseph Folkman (the "**Seller Knowledge Individual**") as to a fact at the time given without any investigation or inquiry. Without limiting the foregoing, Purchaser acknowledges that the Seller Knowledge Individual has not performed and is not obligated to perform any investigation or review of any files or other information in the possession of Seller, or to make any inquiry of any persons, or to take any other actions in connection with the representations and warranties of Seller set forth in this Agreement. Neither the actual, present, conscious knowledge of any other individual or entity, nor the constructive knowledge of the Seller Knowledge Individual or of any other individual or entity, shall be imputed to the Seller Knowledge Individual.

The representations and warranties of Seller set forth in Section 11(c) hereof are subject to the following limitations: (i) that to the extent that Seller has delivered or made available to Purchaser (or to any Diligence Party (as defined below)) any information with respect to the Property, and such other information contain provisions inconsistent with any of Seller's representations and warranties, then such representations and warranties shall be deemed modified to conform to such provisions and Purchaser shall be deemed to have knowledge

thereof, and (ii) in the event that, prior to the Termination Date, Purchaser or any Diligence Party shall obtain knowledge of any information that is contradictory to, and would constitute the basis of a breach of, any representation or warranty or failure to satisfy any condition on the part of Seller, then, promptly thereafter (and, in all events, prior to Closing), Purchaser shall deliver to Seller notice of such information specifying the representation, warranty or condition to which such information relates, and Purchaser acknowledges that such representation or warranty will not be deemed breached in the event Purchaser shall have, prior to Closing, obtained knowledge of any information that is contradictory to such representation or warranty and shall have failed to disclose to Seller as required hereby and Purchaser shall not be entitled to bring any action after the Closing Date based on such representation or warranty. Without limiting the generality of the foregoing, Purchaser shall be deemed to know that any representation or warranty contained herein is untrue, inaccurate or breached to the extent that (1) Purchaser or any Diligence Party has knowledge of any fact or information which is inconsistent with such representation or warranty or (2) this Agreement or any information with respect to the Property delivered or made available to Purchaser or any Diligence Party contain provisions inconsistent with any of such representations and warranties. As used herein, "**Diligence Party**" shall mean any of the following: (i) Purchaser and (ii) any direct or indirect officers, directors, partners, members, shareholders, employees, agents, consultants, affiliates, attorneys and representatives of Purchaser who were involved in the negotiation of this Agreement, reviewed any information relating to the Property, were involved in the preparation of the Diligence Reports or the performance of the due diligence conducted in order to prepare the same, or who otherwise approved the transactions contemplated hereunder. As used herein, "**Diligence Reports**" mean the results of any examinations, inspections, investigations, tests, studies, analyses, appraisals, evaluations and/or investigations prepared by or for or otherwise obtained by or on behalf of Purchaser in connection with the Property.

(d)     None of the provisions of this <u>Section 11</u> shall survive the Closing.

(e)     Purchaser hereby represents and warrants to Seller as of the Effective Date and as of Closing that:

(i)     Purchaser is duly formed and in good standing under the laws of the State of New York, and is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.

(ii)     Purchaser has full power and authority to enter into and perform this Agreement in accordance with its terms and this Agreement and all documents executed by Purchaser which are to be delivered to Seller at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Purchaser and are, and at the time of Closing will be, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

(iii)     Neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited, or requires Purchaser to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

(iv)    There are no judgments, orders or decrees of any kind against Purchaser unpaid and unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to Purchaser's actual knowledge, threatened against Purchaser, which would have a material adverse effect on Purchaser, its financial condition or its ability to consummate the transactions contemplated by this Agreement.

(v)    Purchaser is not acquiring the Property with the assets of an employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), or, if plan assets will be used to acquire the Property, Purchaser will deliver to Seller at Closing a certificate containing such factual representations as shall permit Seller and its counsel to conclude that no prohibited transaction would result from the consummation of the transactions contemplated by this Agreement. Purchaser is not a "party in interest" within the meaning of Section 3(3) of ERISA with respect to any beneficial owner of Seller.

(vi)    Purchaser is not now nor shall it be at any time prior to or at the Closing a Person with whom a U.S. Person is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise. Neither Purchaser nor any Person who owns an interest in Purchaser (collectively, a "**Purchaser Party**") is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a Financial Institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

(vii)    Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this subsection, the term "**Anti-Money Laundering Laws**" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "**Patriot Act**"), the Bank Secrecy Act, 31 U.S.C. Section 5311 *et. seq.*, the Trading with the Enemy Act, 50 U.S.C. App. Section 1 *et. seq.*, the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 *et. seq.*, and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(viii)    Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

(f)    Notwithstanding anything to the contrary set forth in this Agreement, Seller makes no warranty with respect to the presence or absence of Hazardous Materials on, above or beneath the Premises (or any parcel in proximity thereto) or in any water on or under the Premises.  Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws or with respect to any Environmental Liabilities.  The term "**Hazardous Materials**" means (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum, petroleum products and petroleum-derived substances, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "**Asbestos**"), (e) polychlorinated biphenyl ("**PCBs**") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, (h) lead-based paint, (i) pesticides and (j) any other chemicals, materials or substances regulated under any Environmental Law, or defined as or included in the definition of "hazardous substances," "hazardous wastes," "extremely hazardous substances," "hazardous materials," "hazardous constituents," "toxic substances," "pollutants," "contaminants," or any similar denomination intended to classify or regulate such chemicals, materials or substances by reason of their toxicity, carcinogenicity, ignitability, corrosivity or reactivity or other characteristics under any Environmental Law.   The term "**Environmental Laws**" means all federal, state, local or common laws, statutes, ordinances, codes and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments (including any judicial or administrative interpretations, guidances, directives, policy statements or opinions) relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos (including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including, without limitation, 29 C.F.R.  Sections 1910.1001 and 1926.58), applicable New York State and New York City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous

Materials, the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments and any state or local counterpart or equivalent of any of the foregoing, and any related federal, state or local transfer of ownership notification or approval statutes. Except with respect to any claims arising out of any breach of covenants, representations or warranties set forth in Section 11(c) hereof, Purchaser, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller and the other Seller Parties from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Property, including, without limitation, any claim for indemnification or contribution arising under any Environmental Law. The term "**Environmental Liabilities**" means any claims, judgments, damages (including punitive damages), losses, penalties, fines, liabilities, encumbrances, liens, violations, costs and expenses (including attorneys' and consultants' fees) of investigation, remediation, monitoring or defense of any matter relating to human health, safety or the Environment of whatever kind or nature by any party, entity or authority, (A) which are incurred as a result of (i) the existence of Hazardous Materials in, on, under, at or emanating from the Premises, (ii) the offsite transportation, treatment, storage or disposal of Hazardous Materials generated by the Seller, (iii) the violation of any Environmental Laws or (B) which arise under the Environmental Laws. All references in this section to Seller shall include any subsidiaries thereto, and all predecessors thereto, and any person or entity the liabilities of which, pursuant to the Environmental Laws, contractually, by common law, by operation of law or otherwise, Seller may have succeeded to.

(g)    Purchaser shall indemnify, defend, release and hold harmless Seller from any and all claims, judgments, damages (including punitive damages), losses, penalties, fines, liabilities, encumbrances, liens, violations, costs and expenses (including attorneys' and consultants' fees) of investigation, remediation, or monitoring, or defense of any matter relating to human health, safety or the environment of whatever kind or nature by any party, entity or authority, whether contingent or choate, which (A) arise out of or relate to the environmental condition of the Premises, (B) arise out of any Environmental Laws, or (C) arise out of or are incurred as a result of (i) the presence or release of Hazardous Substances in, on, under, at, to or emanating from the Premises prior to or after the Closing, (ii) the offsite transportation, treatment, storage or disposal of Hazardous Substances from the Premises prior to or after the Closing, (iii) the violation of or non-compliance with any Environmental Laws prior to or after the Closing, or (iv) exposure to any Hazardous Substances, noises, odors, vibrations or other conditions existing at or relating to the Premises prior to or after the Closing, which obligation shall survive the Closing.

(h)    In furtherance of Purchaser's covenants contained in this Section 11, Purchaser agrees to perform any and all necessary remediation required in order to obtain from the New York State Department of Environmental Conservation a "No Further Action" letter. The foregoing obligation shall survive the Closing and shall be secured by the L/C.

12.    DAMAGE AND DESTRUCTION.

(a)    If all or any part of the Building is damaged by fire or other casualty occurring on or after the Effective Date and prior to the Closing Date, whether or not such

damage affects a material part of the Building, then neither Seller nor Purchaser shall have any right to terminate this Agreement and the parties hereto shall consummate the transaction contemplated by and in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage. In such event, Seller may retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Premises on account of such physical damage or destruction.

(b)     The provisions of this Section 12 supersede any law applicable to the Premises governing the effect of fire or other casualty in contracts for real property.

13.     CONDEMNATION.

(a)     If, prior to the Closing Date, any part of the Premises is taken (other than a temporary taking), or if Seller shall receive an official notice from any governmental authority having eminent domain power over the Premises of its intention to take, by eminent domain proceeding, any part of the Premises (a "**Taking**"), then Purchaser shall have the option, exercisable on or prior that date (the "**Condemnation Election Date**") which is ten (10) business days after the date Seller has provided Purchaser with a copy of such official notice, time being of the essence, to terminate this Agreement by delivering notice of such termination to Seller, whereupon the Deposit shall be returned to Purchaser and this Agreement shall be deemed canceled and of no further force or effect, and neither party shall have any further rights or liabilities against or to the other except pursuant to the provisions of this Agreement which are expressly provided to survive the termination hereof.

(b)     If a Taking described in this Section 13(a) shall occur and Purchaser shall not timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall, on the Closing Date, (A) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less the reasonable expenses incurred by Seller in connection with such Taking, or (B) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking and Purchaser shall reimburse Seller at the Closing for the reasonable expenses incurred by Seller in connection with such Taking.

(c)     The provisions of this Section 13 supersede any law applicable to the Premises governing the effect of condemnation in contracts for real property.

(d)     In the event of any Taking, the Scheduled Closing Date shall be extended, to the extent necessary, to the tenth (10th) day following the Condemnation Election Date.

14.     BROKERS AND ADVISORS.

(a)     Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor or professional in the capacity of a broker or finder (each, a "**Broker**") in connection

with this Agreement or the transactions contemplated hereby other than Kalmon Dolgin Affiliates Inc. ("**Kalmon Dolgin**"). Each party hereby agrees to indemnify, defend and hold the other and the other Seller Related Parties harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker (other than Kalmon Dolgin) engaged by or claiming to have dealt with such party in connection with this Agreement or the transactions contemplated hereby. Seller shall pay any brokerage commissions due to Kalmon Dolgin pursuant to the terms of a separate agreement.

(b)     The provisions of this Section 14 shall survive the termination of this Agreement or the Closing.

15.     TAX REDUCTION PROCEEDINGS.

Seller may file and/or prosecute an application for the reduction of the assessed valuation of the Premises or any portion thereof for real estate taxes or a refund of Property Taxes previously paid (a "**Tax Certiorari Proceeding**") to the City of New York for any fiscal year. Seller shall have the right to withdraw, settle or otherwise compromise Tax Certiorari Proceedings affecting real estate taxes assessed against the Premises (i) for any fiscal period prior to the fiscal year in which the Closing shall occur and which does not affect Property Taxes for the current fiscal year without the prior consent of Purchaser, and (ii) for the fiscal year in which the Closing shall occur, provided Purchaser shall have consented with respect thereto, which consent shall not be unreasonably withheld, delayed or conditioned. The amount of any tax refunds (net of attorneys' fees and other costs of obtaining such tax refunds) with respect to any portion of the Premises for the tax year in which the Apportionment Date occurs shall be apportioned between Seller and Purchaser as of the Apportionment Date; Seller hereby agreeing to be responsible for the prompt return of any such refund to such tenants for the period up to and including the Apportionment Date and Purchaser having such obligation for the return of any such refunds attributable to the period from and after the Closing Date. If, in lieu of a tax refund, a tax credit is received with respect to any portion of the Premises for the tax year in which the Apportionment Date occurs, then (x) within thirty (30) days after receipt by Seller or Purchaser, as the case may be, of evidence of the actual amount of such tax credit (net of attorneys' fees and other costs of obtaining such tax credit), the tax credit apportionment shall be readjusted between Seller and Purchaser, and (y) within thirty (30) days of realization by Purchaser of a tax savings on account of such credit, Purchaser shall pay to Seller an amount equal to its proportionate share of the savings realized. All refunds, credits or other benefits applicable to any fiscal period prior to the fiscal year in which the Closing shall occur shall belong solely to Seller (and Purchaser shall have no interest therein) and, if the same shall be paid to Purchaser or anyone acting on behalf of Purchaser, same shall be paid to Seller within five (5) days following receipt thereof and, if not timely paid, with interest thereon from the fifth (5th) day following such receipt until paid to Seller at a rate equal to the Default Rate. The provisions of this Section 15 shall survive the Closing.

16.     TRANSFER TAXES AND TRANSACTION COSTS.

(a)     At the Closing, Seller and Purchaser shall execute, acknowledge, deliver

and file all such returns (or, if required by ACRIS E-tax procedures, an electronic version thereof) as may be necessary to comply with Article 31 of the Tax Law of the State of New York and the regulations applicable thereto, and the New York City Real Property Transfer Tax Law (Admin. Code Article 21) and the regulations applicable thereto (collectively, as the same may be amended from time to time, the "**Transfer Tax Laws**"). The transfer taxes payable pursuant to the Transfer Tax Laws shall collectively be referred to as the "**Transfer Taxes**". At Closing, Seller shall pay (or cause to be paid) to the appropriate governmental authority any Transfer Taxes payable in connection with the consummation of the transactions contemplated by this Agreement.

(b)     Seller shall be responsible for the costs of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property.

(c)     Purchaser shall be responsible for (i) the costs and expenses associated with its due diligence, (ii) the costs and expenses of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property, (iii) all premiums and fees for title examination and title insurance and endorsements obtained and all related charges and survey costs in connection therewith, and (iv) any recording fees for documentation to be recorded in connection with the transactions contemplated by this Agreement.

(d)     The provisions of this Section 16 shall survive the Closing.

17.     DELIVERIES TO BE MADE ON THE CLOSING DATE.

(a)     Seller's Documents and Deliveries:  On the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)     A duly executed and acknowledged Bargain and Sale Deed Without Covenants Against Grantor's Acts in the form of Exhibit 2 annexed hereto and made a part hereof;

(ii)     A duly executed certification as to Seller's nonforeign status as prescribed in Section 21 hereof, in the form of Exhibit 3 annexed hereto and made a part hereof;

(iii)     A good standing certificate for Seller by the State of New York dated within thirty (30) days of the Closing Date, together with copies of the certificate of incorporation and by-laws of Seller and of the resolutions of the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, certified as true and correct by the Secretary or Assistant Secretary of Seller; and

(iv)     A closing statement listing the apportionments made at the Closing as provided herein.

(b)     Purchaser's Documents and Deliveries:  On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller the following:

(i)     Payment of the balance of the Purchase Price, as adjusted for

apportionments under <u>Section 7</u> hereof, in the manner required under this Agreement;

    (ii)  The L/C (as defined in <u>Section 38</u> below);

    (iii)  (1) copies of Purchaser's articles of organization and consent of the members of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, including the delivery of the L/C, all of the foregoing being certified as true and correct by the manager(s)/managing member(s), as applicable, of Purchaser; (2) a good standing certificate issued for Purchaser by the state of organization of Purchaser, dated within thirty (30) days of the Closing Date; (3) a good standing certificate for Purchaser issued by the State of New York (if not organized in the State of New York) dated within thirty (30) days of the Closing Date; and (4) an incumbency certificate executed by an officer or manager(s)/managing member(s), as applicable, of Purchaser with respect to individuals executing any documents or instruments on behalf of Purchaser in connection with the transactions contemplated herein.

    (c)  <u>Jointly Executed Documents</u>: Seller and Purchaser shall, on the Closing Date, each execute, acknowledge (as appropriate) and exchange the following documents:

    (i)  The returns required under the Transfer Tax Laws, if any, and any other tax laws applicable to the transactions contemplated herein;

    (ii)  An Omnibus Assignment and Assumption Agreement in the form of <u>Exhibit 4</u> annexed hereto and made a part hereof; and

    (iii)  Any other affidavits, documents or instruments required to be delivered by Seller or Purchaser or reasonably requested by the Title Company (so long as such request does not add additional warranties or covenants to Seller), pursuant to the terms of this Agreement or applicable law in order to effectuate the transfer of title to the Property.

  18.  <u>CLOSING DATE.</u>

    The closing of the transactions contemplated hereunder (the "**Closing**") shall occur, and the documents referred to in <u>Section 17</u> hereof shall be delivered upon tender of the Purchase Price provided for and compliance with all other conditions set forth in this Agreement, at 10:00 A.M., Eastern Standard Time, on July 23, 2012 (the "**Scheduled Closing Date**"); and the actual date of the Closing, the "**Closing Date**"), at the offices of Seller's attorneys, Pryor Cashman LLP, 7 Times Square, New York, New York 10036 or, at the election of Purchaser, by notice given at least two (2) business days prior to the Scheduled Closing Date, at the office of Purchaser's lender or such lender's counsel so long as such office is in Manhattan, or via escrow through the Title Company. *Time is hereby made of the essence as to Purchaser's obligation to close the transaction contemplated hereunder on the Scheduled Closing Date.* Notwithstanding the foregoing, Purchaser, by notice to Escrow Agent given via e-mail to Samson R. Bechhofer, Esq. at sbechhofer@pryorcashman.com given at least five (5) business days before the Scheduled Closing Date, may extend the Scheduled Closing Date by fifteen (15) business days, in which event *time shall be of the essence as to the giving of such notice and as to Purchaser's obligation to close the transaction contemplated hereunder on such extended Closing Date.*

19.    NOTICES.

        All notices, demands, requests or other communications (collectively, "**Notices**") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national overnight delivery service, or (c) facsimile transmission (provided that the original shall be simultaneously delivered by national overnight delivery service or personal delivery), or (d) personal delivery, addressed as follows:

        (i)      If to Seller:

           49 Dupont Realty Corp.
           c/o Flexon Industries
           1 Flexon Plaza
           Newark, New Jersey 07114
           Attention:  Joseph Folkman
           Fax:  (973) 824-1208

           with a copy to:

           Pryor Cashman LLP
           7 Times Square, 3rd Floor
           New York, New York 10036-6568
           Attention: Samson R. Bechhofer, Esq.
           Fax:  (212) 798-6921

        (ii)     If to Purchaser:

           c/o Fink & Zelmanovitz, P.C.
           3839 Flatlands Avenue, Suite 206
           Brooklyn, New York 11234
           Attention: Judah A. Zelmanovitz, Esq.
           Fax:  (718) 377-7603

           with a copy to:

        Any Notice so sent shall be deemed received (i) on the day delivered if sent by personal delivery, (ii) three (3) business days after mailing if sent by certified or registered mail, (iii) one (1) business day after delivery to a national overnight delivery service for next business day delivery and (iv) on the day of e-mail transmission if sent during business hours, or if not, on the next business day.  A Notice may be given either by a party or by such party's attorney. Seller or Purchaser may designate, by not less than five (5) business days' notice given to the others in accordance with the terms of this Section 19, substituted parties and/or different addresses to whom or to which Notices should be sent hereunder.  Notwithstanding the above, any notice from Purchaser to Escrow Agent in connection with a termination of contract or request for any extension of time for any provision hereunder may be sent to Escrow Agent via email to sbechhofer@pryorcashman.com.

20.    <u>DEFAULT BY PURCHASER OR SELLER</u>.

(a)    If (i) Purchaser shall default in the payment of the Additional Deposit, or in the payment of the Purchase Price, or in the performance of any of its other obligations to be performed on the Closing Date, or (ii) Purchaser shall default in the performance of any of its material obligations to be performed prior to the Closing Date and, with respect to any default under this clause (ii) only, such default shall continue for five (5) business days after notice to Purchaser, Seller's sole remedy by reason thereof shall be to terminate this Agreement and, upon such termination, Seller shall be entitled to retain the Deposit as liquidated damages for Purchaser's default hereunder, it being agreed that the damages by reason of Purchaser's default are difficult, if not impossible, to ascertain, and thereafter Purchaser and Seller shall have no further rights or obligations under this Agreement, except for those that are expressly provided in this Agreement to survive the termination hereof.  If Seller properly terminates this Agreement pursuant to the foregoing provision and Purchaser takes any action which interferes with Seller's ability to sell, exchange, transfer, lease, dispose of or finance the Property, or takes any other actions with respect thereto (including, without limitation, the filing of any lis pendens or other form of attachment against the Property), then the named Purchaser (and any permitted assignee of Purchaser's interest hereunder) shall be jointly and severally liable for all loss, cost, damage, liability or expense (including, without limitation, attorneys' fees, court costs and disbursements and consequential damages) incurred by Seller by reason of such action to contest by Purchaser.

(b)    If (x) Seller shall default in any of its obligations to be performed on the Closing Date or (y) Seller shall default in the performance of any of its material obligations to be performed prior to the Closing Date and, with respect to any default under this <u>clause (y)</u> only, such default shall continue for five (5) business days after notice to Seller, Purchaser as its sole remedy by reason thereof (in lieu of prosecuting an action for damages or proceeding with any other legal or equitable course of conduct, the right to bring such actions or proceedings being expressly and voluntarily waived by Purchaser, to the extent legally permissible, following and upon advice of its counsel) shall have the right, subject to the other provisions of this <u>Section 20(b)</u>, (i) to seek to obtain specific performance of Seller's obligations hereunder, <u>provided</u> that any action for specific performance shall be commenced within ninety (90) days after such default, or (ii) to receive a return of the Deposit, it being understood that if Purchaser fails to commence an action for specific performance within ninety (90) days after such default, Purchaser's sole remedy shall be to receive a return of the Deposit.  Upon such return, this Agreement shall terminate and neither party hereto shall have any further obligations hereunder, except for those that are expressly provided in this Agreement to survive the termination hereof. If Purchaser elects to seek specific performance of this Agreement, then as a condition precedent to any suit for specific performance, Purchaser shall on or before the Closing Date, time being of the essence, fully perform all of its obligations hereunder which are capable of being performed (other than the payment of the Purchase Price, which shall be paid as and when required by the court in the suit for specific performance).  Notwithstanding the foregoing, Purchaser shall have no right to seek specific performance if Seller shall be prohibited from performing its obligations hereunder by reason of any law, regulation or other legal requirement applicable to Seller.

(c)    The provisions of this <u>Section 20</u> shall survive the termination hereof.

21.    <u>FIRPTA COMPLIANCE</u>.

Seller shall comply with the provisions of the Foreign Investment in Real Property Tax Act, Section 1445 of the Internal Revenue Code of 1986 (as amended, "**FIRPTA**"). Seller acknowledges that Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. To inform Purchaser that withholding of tax is not required upon the disposition of a United States real property interest by Seller, Seller hereby represents and warrants that Seller is not a foreign person as that term is defined in the Internal Revenue Code and Income Tax Regulations. On the Closing Date, Seller shall deliver to Purchaser a certification as to Seller's non-foreign status in the form of <u>Exhibit 6</u> annexed hereto and made a part hereof, and shall comply with any temporary or final regulations promulgated with respect thereto and any relevant revenue procedures or other officially published announcements of the Internal Revenue Service of the U.S. Department of the Treasury in connection therewith. The provisions of this <u>Section 21</u> shall survive the Closing.

22.    <u>ENTIRE AGREEMENT</u>.

This Agreement contains all of the terms agreed upon between Seller and Purchaser with respect to the subject matter hereof, and all prior agreements, understandings, representations and statements, oral or written, between Seller and Purchaser are merged into this Agreement. The provisions of this <u>Section 22</u> shall survive the Closing or the termination hereof.

23.    <u>AMENDMENTS</u>.

This Agreement may not be changed, modified or terminated, except by an instrument executed by Seller and Purchaser. The provisions of this <u>Section 23</u> shall survive the Closing or the termination hereof.

24.    <u>WAIVER</u>.

No waiver by either party of any failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent failure or refusal to so comply. The provisions of this <u>Section 24</u> shall survive the Closing or the termination hereof.

25.    <u>PARTIAL INVALIDITY</u>.

If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law. The provisions of this <u>Section 25</u> shall survive the Closing or the termination hereof.

26.    SECTION HEADINGS.

The headings of the various sections of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.

27.    GOVERNING LAW.

This Agreement shall be governed by the laws of the State of New York without giving effect to conflict of laws principles thereof, and Purchaser and Seller each hereby waives any defense to any action or proceeding granted by the laws of any other country or jurisdiction unless such defense is also allowed by the laws of the State of New York. All claims, disputes and other matters in question with respect to this Agreement, or the breach thereof, shall be decided by proceedings instituted and litigated in a court for the district in which the Property is situated, and the parties hereto expressly consent and submit to the venue and jurisdiction of such court. The provisions of this Section 27 shall survive the Closing or the termination hereof.

28.    PARTIES; ASSIGNMENT AND RECORDING.

(a)    This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon Seller and Purchaser and their respective successors and permitted assigns; provided, however, that none of the representations or warranties made by Seller hereunder shall inure to the benefit of any person or entity that may, after the Closing Date, succeed to Purchaser's interest in the Property.

(b)    Purchaser may not assign or otherwise transfer this Agreement or any of its rights or obligations hereunder or any of the direct or indirect ownership interests in Purchaser, without first obtaining Seller's consent thereto.

(c)    Neither this Agreement nor any memorandum hereof may be recorded by or on behalf of Purchaser without first obtaining Seller's consent thereto. Any breach of the provisions of this clause (c) shall constitute a default by Purchaser under this Agreement. Purchaser agrees not to file any lis pendens or other instrument against all or a portion of the Premises in connection herewith. In furtherance of the foregoing, Purchaser (i) acknowledges that the filing of a lis pendens or other evidence of Purchaser's rights or the existence of this Agreement against all or a portion of the Premises could cause significant monetary and other damages to Seller and (ii) hereby agrees to indemnify Seller from and against any and all claims, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements incurred in the enforcement of the foregoing indemnification obligation) arising out of the breach by Purchaser of any of its obligations under this clause (c).

(d)    The provisions of Section 28(a) and 28(c) hereof shall survive the Closing or the termination hereof. The provisions of Section 28(b) hereof shall survive the termination hereof.

29. <u>FURTHER ASSURANCES.</u>

Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other party, for the better assuring, conveying, assigning, transferring and confirming unto Purchaser the Property and for carrying out the intentions or facilitating the consummation of this Agreement, provided the same do not expand Seller's obligations or liabilities hereunder. The provisions of this <u>Section 29</u> shall survive the Closing.

30. <u>THIRD PARTY BENEFICIARY.</u>

This Agreement is an agreement solely for the benefit of Seller and Purchaser (and their permitted successors and/or assigns). No other person, party or entity shall have any rights hereunder nor shall any other person, party or entity be entitled to rely upon the terms, covenants and provisions contained herein. The provisions of this <u>Section 30</u> shall survive the Closing or the termination hereof.

31. <u>JURISDICTION AND SERVICE OF PROCESS.</u>

The parties hereto agree to submit to personal jurisdiction in the State of New York in any action or proceeding arising out of this Agreement and, in furtherance of such agreement, the parties hereby agree and consent that without limiting other methods of obtaining jurisdiction, personal jurisdiction over the parties in any such action or proceeding may be obtained within or without the jurisdiction of any court located in New York and that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the parties by registered or certified mail to or by personal service at the last known address of the parties, whether such address be within or without the jurisdiction of any such court. Any legal suit, action or other proceeding by one party to this Agreement against the other arising out of or relating to this Agreement (other than any dispute which, pursuant to the express terms of this Agreement, is to be determined by arbitration) shall be instituted only in the Supreme Court of the State of New York, County of New York or the United States District Court for the Southern District of New York, and each party hereby waives any objections which it may now or hereafter have based on venue and/or forum non-conveniens of any such suit, action or proceeding and submits to the jurisdiction of such courts. Purchaser hereby (a) irrevocably designates Stephen Friedman, Esq. or any successor counsel to Purchaser located in Manhattan, to accept service of any process on Purchaser's behalf and hereby agrees that such service shall be deemed sufficient and (b) agrees that any final judgment rendered against it in any such action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. The provisions of this <u>Section 31</u> shall survive the Closing or the termination hereof.

32. <u>WAIVER OF TRIAL BY JURY.</u>

Seller and Purchaser hereby irrevocably and unconditionally waive any and all right to trial by jury in any action, suit or counterclaim arising in connection with, out of or otherwise relating to this Agreement. The provisions of this <u>Section 32</u> shall survive the Closing or the termination hereof.

33.    <u>MISCELLANEOUS.</u>

(a)    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.  This Agreement may be executed by PDF or facsimile transmission.

(b)    Any consent or approval to be given hereunder (whether by Seller or Purchaser) shall not be effective unless the same shall be given in advance of the taking of the action for which consent or approval is requested and shall be in writing.  Except as otherwise expressly provided herein, any consent or approval requested of Seller or Purchaser may be withheld by Seller or Purchaser in its sole and absolute discretion.

(c)    The attorneys for Purchaser are hereby designated the "real estate reporting person" for purposes of Section 6045 of the Code and Treasury Regulation 1.6045-4.

(d)    Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

(e)    Seller and Purchaser are each represented by counsel in the negotiation of this Agreement.  Accordingly, ambiguities in this Agreement shall not be construed against the party drafting this Agreement, notwithstanding any contrary rule of construction or interpretation at law or in equity.

(f)    The provisions of this <u>Section 33</u> shall survive the Closing or the termination hereof.

34.    <u>REPRESENTATIONS UPDATE.</u>

Seller's Representations in <u>Section 11(c)</u> hereof shall be true and correct in all material respects as of the Closing Date (except that, in the case of a Representation that by its terms is made as of a specified date or the Effective Date, it need be only true and correct as of such date), with appropriate modifications or qualifications to those Representations to reflect the results of any condemnation of the Premises or any action taken, or event, or any omission, by or on behalf of Seller in accordance with or permitted by the provisions of this Agreement, but without regard to any other modifications or qualifications of those Representations that may be necessary to make such Representations true and correct (any such other modification or qualification, a "**Qualification**").  If, at the Closing, Seller must add any new Qualification to any of Seller's Representations in accordance with the terms and provisions of this <u>Section 34</u> in order to make those Representations true and correct in all material respects as if remade on and as of the Closing (or, in the case of a Representation that by its terms is made as of a specified date or the Effective Date, as of such date), Purchaser shall have no right, remedy or claim against Seller, unless the sum of (w) in the case of Qualifications resulting from circumstances that can be cured by the payment of money, the aggregate cost of correcting all such circumstances, plus (x) in the case of Qualifications resulting from circumstances that cannot readily be corrected with the payment of money, the aggregate diminution in the value of the Property exceeds the Threshold Amount, it being agreed that any uncured circumstances

involving net costs and/or impairments to value that, when taken together with all prior such costs and impairments to value identified by Seller (after giving credit for any credits or cash payments made by Seller to offset the effect of those costs and impairments to value), in the aggregate, do not exceed the Threshold Amount shall be deemed immaterial, shall not be a Qualification and Purchaser shall have no remedy therefor.  In the event any such uncured circumstances involve net costs and/or impairments to value that, when taken together with all prior such costs and impairments to value identified by Seller (after giving credit for any credits or cash payments made by the Seller set forth above), are in excess of the Threshold Amount, Purchaser's rights shall be governed by Sections 20(c) and (d) hereof.

35.     EXCULPATION.

Purchaser agrees that it does not have and will not have any claims or causes of action against any Seller Parties, arising out of or in connection with this Agreement or the transactions contemplated hereby.  Purchaser agrees to look solely to Seller's interest in the Building or, if the closing has occurred, the net proceeds of the sale (subject to the limitations contained herein) for the satisfaction of any liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the covenants, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's other assets or properties or any other Seller Parties (or their assets or properties) with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.  The provisions of this Section 35 shall survive the termination of this Agreement and the Closing.

36.     TAX DEFERRED EXCHANGE

(a)     Seller shall have the right to structure the sale of the Premises as a forward and/or reverse exchange thereof for other real property of a like-kind to be designated by Seller (collectively, "**Seller 1031 Exchange**") (including the ability to assign this Agreement to an entity established in order to effectuate such exchange including a qualified intermediary, an exchange accommodation title holder or one or more single member limited liability companies that are owned by any of the foregoing persons (any of the foregoing being a "**QI**")), with the result that the exchange shall qualify for non-recognition of gain or loss under Section 1031 of the Internal Revenue Code of 1986, as amended, the Treasury Regulations thereunder and IRS Revenue Procedure 2000-37.  In connection with the Seller 1031 Exchange, Seller may, if it so elects, at its sole discretion, extend the Scheduled Closing Date for a period or periods not to exceed forty-five (45) days in the aggregate.  If Seller shall reschedule the Scheduled Closing Date in accordance with the foregoing sentence, such rescheduled Scheduled Closing Date shall be deemed the "Scheduled Closing Date" for purposes of this Agreement.  Purchaser shall execute any and all documents reasonably requested by Seller to effect the Seller 1031 Exchange, and otherwise assist and cooperate with Seller in effecting the Seller 1031 Exchange, provided same shall be at no cost or expense to Purchaser.

(b)     Purchaser shall have the right to structure the purchase of the Premises as a forward and/or reverse exchange thereof for other real property of a like-kind to be designated by Purchaser (collectively, "**Purchaser 1031 Exchange**") (including the ability to assign this Agreement to a QI), with the result that the exchange shall qualify for non-recognition of gain or

loss under Section 1031 of the Internal Revenue Code of 1986, as amended, the Treasury Regulations thereunder and IRS Revenue Procedure 2000-37. Seller shall execute any and all documents reasonably requested by Purchaser to effect the Purchaser 1031 Exchange, and otherwise assist and cooperate with Seller in effecting the Purchaser 1031 Exchange, provided same shall be at no cost or expense to Seller.

37. <u>CONFIDENTIALITY</u>

The parties hereto covenant and agree not to communicate the terms or any aspect of this Agreement and the transactions contemplated hereby (which shall include any public announcement regarding the closing of the sale) to any person or entity and to hold, in the strictest confidence, the content of any and all information in respect of the Premises which is supplied by Seller to Purchaser or by Purchaser to Seller, without the express written consent of the other party; <u>provided</u>, <u>however</u>, that each party may, without consent, disclose the terms hereof and the transactions contemplated hereby (a) to its advisors, consultants, attorneys, accountants, mortgage brokers and mortgage lenders (collectively, the "**Transaction Parties**") without the express written consent of the other, so long as any such Transaction Parties to whom disclosure is made shall also agree to keep all such information confidential in accordance with the terms hereof and (b) if such disclosure is required by law or by regulatory or judicial process provided that in such event Purchaser shall notify the Seller in writing of such required disclosure, shall exercise all commercially reasonable efforts to preserve the confidentiality of the confidential documents or information, as the case may be, including, without limitation, reasonably cooperating with the Seller to obtain an appropriate order or other reliable assurance that confidential treatment will be accorded such confidential documents or information, as the case may be, by such tribunal and shall disclose only that portion of the confidential documents or information which it is legally required to disclose. If this Agreement is terminated, such confidentiality shall be maintained and Purchaser and the Transaction Parties will destroy or deliver to Seller all documents and other materials, and all copies thereof, obtained thereby in connection with this Agreement that are subject to such confidentiality, with any such destruction confirmed by Purchaser and the Transaction Parties in writing. The foregoing confidentiality obligations shall not apply to the extent that any such information is a matter of public record or is provided in other sources readily available to the real estate industry other than as a result of disclosure by Purchaser or the Transaction Parties. Purchaser hereby indemnifies Seller against, and holds Seller harmless from, any and all claims, losses, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising in connection with Purchaser's obligations under this <u>Section 37</u>. The provisions of this <u>Section 37</u> shall survive the Closing and/or termination of this Agreement.

38. <u>POST-CLOSING ENVIRONMENTAL REMEDIATION</u>

(a) Definitions. The following definitions are intended to supplement those contained in <u>Section 11(f)</u> of this Agreement.

As used in this <u>Section 38</u>, the following terms shall have the meanings ascribed to them below:

"**Environmental Claims**" refers to any complaint, summons, citation, notice of

34

violation, notice of potential liability, directive, order, claim, litigation, investigation, proceeding, judgment, letter, or other communication from any governmental agency, department, bureau, office, or other authority, or any third party involving violations of Environmental Laws or Releases of Hazardous Materials at or from the Premises.

"**Environmental Conditions**" refers to Releases of Hazardous Materials at or from the Premises requiring a Remedial Action or violations of Environmental Laws

"**Environmental Laws**" includes the Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), 42 U.S.C. 9601 et seq., as amended; the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. 6901 et seq., as amended; the Clean Air Act ("**CAA**"), 42 U.S.C. 7401 et seq., as amended; the Clean Water Act ("**CWA**"), 33 U.S.C. 1251 et seq., as amended; the New York Inactive Hazardous Waste Disposal Sites Law, N.Y. ECL § 27-1301 et seq.; the New York Control of the Bulk Storage of Petroleum Law, N.Y. ECL §17-1001 et seq.; the New York Oil Spill Prevention, Control and Compensation Act, Navigation Law §§170-202; the N.Y. Labor Law §241; the New York City Hazardous Materials Emergency Response Law, New York City Administrative Code §24-601 et seq.; Control of Lead Poisoning, N.Y. Pub. Health Law §1370 et seq.; and any other federal, state, local, or municipal laws, statutes, regulations, rules, or ordinances imposing liability or establishing standards of conduct for protection of the environment.

"**Environmental Liabilities**" means any monetary obligations, losses, liabilities (including strict liability), damages, punitive damages, consequential damages, treble damages, costs, and expenses (including all reasonable out-of-pocket fees, disbursements and expenses of counsel, out-of-pocket expert and consulting fees, and out-of-pocket costs for environmental site assessments, remedial investigation, and feasibility studies), natural resources damages, property damages (real or personal), personal injuries (including wrongful death), civil or criminal penalties, fines, sanctions and interest incurred as a result of any Environmental Claim filed by any Governmental Authority or any third party which relate to any violations of Environmental Laws, Remedial Actions, Releases or threatened Releases of Hazardous Materials at or from the Premises, whether known or unknown, disclosed or undisclosed, and any violations of Environmental Laws at the Premises.

"**Environmental Lien**" means any lien, security interest, charge or other encumbrance for Environmental Liabilities incurred by a Government Authority

"**Hazardous Materials**" shall include (a) any element, compound, or chemical that is defined, listed, or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws; (b) petroleum, petroleum-based, or petroleum-derived products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic including but not limited to corrosivity, ignitibility, toxicity, or reactivity as well as any radioactive or explosive materials; and (e) any asbestos-containing materials.

"**Release**" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers, or other closed receptacles

containing Hazardous Materials) into the environment.

**"Remedial Action"** means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any other way address Hazardous Materials in the indoor or outdoor environment; (ii) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (iv) any other actions required pursuant to NYSDEC Program Policy DER-10 "Technical Guidance for Site Investigation and Remediation".

(b) Environmental Inspection.

A.   Purchaser acknowledges that a portion of the Premises has been listed on the New York State Registry of Inactive Hazardous Waste Disposal Sites in New York State as Site No. 224136 known as the "Former NuHart Plastic Manufacturing pursuant to Environmental Conservation Law (ECL) § 27-1305 and that Seller is implementing a remedial program pursuant to an Order on Consent and Administrative Settlement with the New York State Department of Environmental Conservation ("**NYSDEC**"), Index # R2-0654-11-10 (the "**NYSDEC Order**").  Purchaser also acknowledges that a portion of the Premises is listed on the NYSDEC Spills Database as Spill 06-01852 for petroleum discharge from former underground storage tank and that Seller is implementing a remedial program under the supervision of the NYSDEC (the "**Petroleum Spill Response Program**").

B.   Purchaser acknowledges that Seller has provided to Purchaser the environmental reports identified on Schedule D annexed hereto (collectively, the "**Environmental Reports**").  Seller has not made and makes no representations or warranties, expressed or implied, with respect to the Environmental Conditions of the Premises, and specifically disclaims any representation or warranty regarding the presence or absence of Hazardous Materials at, to, under or about the Premises or the compliance or noncompliance with Environmental Laws. The disclaimer set forth herein shall not be affected or limited by the delivery by Seller to Purchaser of any Environmental Reports.  Purchaser agrees that the Environmental Reports provided to Purchaser or its consultants by Seller shall not be deemed representations or warranties of Seller, that Seller has provided the Environmental Reports to Purchaser for Seller's own benefit to facilitate the Environmental Inspection Period.  Purchaser acknowledges that Purchaser has not relied, and is not relying on the Environmental Reports and that Purchaser shall rely solely on its environmental site assessment of the Premises. Purchaser shall keep any information generated during the Environmental Inspection Period as confidential unless required by law and shall not disclose such to any third party without prior approval of Seller.

**D.   THE PREMISES IS HEREBY CONVEYED AND ACCEPTED IN ITS "AS IS, WHERE IS" CONDITION ON THE CLOSING DATE, WITH NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, PURCHASER DOES HEREBY WAIVE, RELEASE, AND DISCHARGE SELLER FROM AND AGAINST ALL ENVIRONMENTAL LIABILITIES.  ALL REFERENCES IN THIS SECTION 38 TO SELLER SHALL INCLUDE ANY SUBSIDIARIES**

36

**THERETO, AND ALL PREDECESSORS THERETO, AND ANY PERSON OR ENTITY THE LIABILITIES OF WHICH, PURSUANT TO THE ENVIRONMENTAL LAWS, CONTRACTUALLY, BY COMMON LAW, BY OPERATION OF LAW OR OTHERWISE, SELLER MAY HAVE SUCCEEDED TO.**

(c) <u>Purchaser's Environmental Covenants</u>.

A. Purchaser shall assume responsibility for implementing the remedial program under the NYSDEC Order and the Petroleum Remedial Program, and obtaining a Certificate of Completion with a covenant not to sue from NYSDEC confirming that all obligations under the NYSDEC Order and Petroleum Spill Response Program have been completed.

B. As a condition precedent to Seller's obligation to sell the Premises:

1. Purchaser shall either enter into a new order on consent with the NYSDEC or amend the NYSDEC Order to add Purchaser as a respondent to the NYSDEC Order, and

2. To ensure that Purchase satisfies its obligations under this Agreement to implement and complete its obligations in Subparagraphs (c)(A) and (d) of this <u>Section 38</u>, Purchaser shall prior to the Closing deliver to Seller an irrevocable standby letter of credit in the face amount of $2,000,000.00 (the "<u>L/C</u>"), naming Seller as beneficiary, to secure each and all indemnity and defense obligations of Purchaser above, and drawable by sight draft deliverable by Seller stating that Purchaser (or its successor(s) in interest) have breached such indemnity or defense obligations (or drawable by Seller at any time within 30 days prior to the L/C expiration date), and otherwise from an issuing bank and containing such terms and conditions as are reasonably acceptable to Seller. The L/C shall provide that upon the conveyance of the Premises, the beneficiary of the L/C shall be entitled to draw thereon unless a substitute letter of credit in form and substance satisfactory to Seller is delivered to Seller by the party to whom the Premises are conveyed.

(d) <u>Purchaser Release and Indemnity</u>

Purchaser hereby irrevocably waives all such contractual, statutory, or common law rights and remedies against Seller for any Environmental Claims and Environmental Liabilities. Purchaser further releases and holds Seller harmless from any and all Environmental Claims and Environmental Liabilities. Purchaser hereby agrees to indemnify and defend Seller from and against any Environmental Claims and Environmental Liabilities.

(e) <u>Survival</u>.

The provisions of this <u>Section 38</u> shall survive the Closing and delivery of the Deed.

*[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed the day and year first above written.

**SELLER**:

**49 DUPONT REALTY CORP.**

By:_____
     Name:  David Rauch
     Title:    Vice President

**PURCHASER:**

**DUPONT STREET DEVELOPERS LLC**

By:_____
     Name:  Judah A. Zelmanovitz
     Title:  Authorized Signatory

The undersigned hereby
acknowledges and consents
to the provisions of Sections 4(b) hereof:

**Pryor Cashman LLP,**
  as Escrow Agent

By:_____
     Name:      Samson R. Bechhofer, Esq.
     Title:      Partner

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed the day and year first above written.

<u>**SELLER**</u>:

**49 DUPONT REALTY CORP.**

By: _____

     Name:  David Rauch
     Title:   Vice President

<u>**PURCHASER**</u>:

**DUPONT STREET DEVELOPERS LLC**

By: _____

     Name:  Judah A. Zelmanovitz
     Title:  Authorized Signatory

The undersigned hereby
acknowledges and consents
to the provisions of <u>Sections 4(b)</u> hereof:

**Pryor Cashman LLP,**
  as Escrow Agent

By: _____
    Name:    Samson R. Bechhofer, Esq.
    Title:     Partner

## SCHEDULE A

### Description of the Land

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, and identified on the Tax Map of the City of New York for the County of Kings as Lots 1, 10, 12, 17, 18, 20, 21, 57, 72 and 78 in Block 2487.

## SCHEDULE B

### Excluded Personalty

[TBD]

SCHEDULE C

Litigation

<u>Carla Dominguez vs. 49 Dupont Realty Corp.</u>, filed in Supreme, Kings County, Index No. 501062/2012 (trip and fall)

<u>SCHEDULE D</u>

<u>Environmental Reports</u>

[to follow]

<u>EXHIBIT 1</u>

<u>Escrow Agent's Wire Instructions</u>

CITIBANK NA
666 5th Avenue 5th FL
New York, New York 10103
Attn: Nadia Rodriguez, Vice President
Tel: 212-559-0206


ABA #: 021000089


Account Name: PRYOR CASHMAN LLP Attorney Trust Account


<u>Account #: 9936793934</u>


Reference: FOLKMAN/DUPONT


3

<u>EXHIBIT 2</u>

**<u>Form of Deed</u>**

THIS INDENTURE, made as of the _____ day of _____, 2012, by **49 DUPONT REALTY CORP.**, a New York corporation (hereinafter referred to as "<u>Grantor</u>"), having an office c/o Flexon Industries, 1 Flexon Plaza, Newark, New Jersey 07114, and **Dupont Street Developers LLC**, a New York limited liability company having an address (hereinafter referred to as "<u>Grantee</u>"), having an office at c/o Fink & Zelmanovitz, P.C., 3839 Flatlands Avenue, Suite 206, Brooklyn, New York 11234.

WITNESSETH, that Grantor, in consideration of Ten ($10.00) Dollars, lawful money of the United States, paid by Grantee, does hereby grant and release unto Grantee, the heirs or successors and assigns of Grantee forever:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, and more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof (the "<u>Premises</u>"); the Premises are also known by the street address 49-55 Dupont Street, Brooklyn, New York (Tax Map Designation: Tax Block 2487, Tax Lots 1, 10, 12, 17, 18, 20, 21, 57, 72 & 78).

BEING the same premises conveyed to Grantor by deed dated _____, recorded on _____ in the City Register's Office, Kings County in _____.

TOGETHER WITH all right, title and interest, if any, of Grantor in and to any streets and roads abutting the Premises to the center lines thereof;

TOGETHER WITH the appurtenances and all the estate and rights of Grantor in and to the Premises.

TO HAVE AND TO HOLD the Premises unto Grantee, the heirs or successors and assigns of Grantee forever.

AND Grantor, in compliance with Section 13 of the Lien Law, covenants that Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements at the Premises and will apply the same first to the payment of the cost of the improvements before using any part of the total of the same for any other purpose.

IN WITNESS WHEREOF, Grantor has duly executed this deed the day and year first above written.

GRANTOR:

**49 DUPONT REALTY CORP.**

By: _____

Joseph Folkman

President

1

STATE OF NEW YORK          )
                                ) ss.:

COUNTY OF NEW YORK     )

On the ___ day of _____ in the year 2012 before me, the undersigned, personally appeared JOSEPH FOLKMAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

_____

Signature and Office of individual
taking acknowledgment

 

**Bargain and Sale Deed**
**Without Covenant Against Grantor's Acts**

SECTION:
BLOCK:
LOT:
COUNTY:

**49 DUPONT REALTY CORP.**

STREET ADDRESS:

TO

**DUPONT STREET DEVELOPERS LLC**

RETURN BY MAIL TO:
Fink & Zelmanovitz, P.C.
3839 Flatlands Avenue, Suite 206
Brooklyn, New York 11234
Attention:  Judah A. Zelmanovitz, Esq.

2

Exhibit A

Legal Description

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, and identified on the Tax Map of the City of New York for the County of Kings as Lots 1, 10, 12, 17, 18, 20, 21, 57, 72 and 78 in Block 2487.

<u>EXHIBIT 3</u>

**FIRPTA Affidavit**

   Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **49 DUPONT REALTY CORP.**, a New York corporation ("<u>Seller</u>"), the undersigned hereby certifies the following on behalf of Seller:

   1.  Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as such terms are defined in the Internal Revenue Code and Income Tax Regulations).

   2.  Seller's U.S. employer identification number is 11-2716399.

   3.  Seller's office address is c/o Flexon Industries, 1 Flexon Plaza, Newark, New Jersey 07114.

   The undersigned understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

   Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Seller.

     **49 DUPONT REALTY CORP.**

     By:_____
       Name: Joseph Folkman
       Title:  President

_____, 2012

<u>EXHIBIT 4</u>

**<u>Form of Omnibus Assignment and Assumption Agreement</u>**

THIS GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT, made and entered into this _____ day of _____, 2012, between **49 DUPONT REALTY CORP.**, a New York corporation ("<u>Assignor</u>"),with offices c/o Flexon Industries, 1 Flexon Plaza, Newark, New Jersey 07114, and **Dupont Street Developers LLC**, a New York limited liability company having an address ("<u>Assignee</u>"), having an office at c/o Fink & Zelmanovitz, P.C., 3839 Flatlands Avenue, Suite 206, Brooklyn, New York 11234.

W I T N E S S E T H :

Assignor, for Ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns to Assignee all of Assignor's right, title and interest in and to all items of intangible personal property owned by Assignor and exclusively relating to the occupancy, use or operation of the real property located at 49-55 Dupont Street, Brooklyn, New York (the "<u>Premises</u>") (other than items expressly excluded from the sale of the Premises pursuant to that certain Purchase and Sale Agreement, dated June __, 2012 between Assignor and Assignee) (collectively, the "<u>Property Matters</u>");

TO HAVE AND TO HOLD unto Assignee and its successors and assigns to its and their own use and benefit forever.

Assignee hereby expressly assumes the obligations of Assignor in respect of the Property Matters accruing from and after the date hereof.

This Agreement is made by Assignor without recourse and without any expressed or implied representation or warranty whatsoever.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[remainder of this page intentionally left blank]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Omnibus Assignment and Assumption Agreement as of the date first above written.

**ASSIGNOR:**

**49 DUPONT REALTY CORP.**

By:_____
       Name: Joseph Folkman
       Title:   President

**ASSIGNEE:**

**DUPONT STREET DEVELOPERS LLC**

By:_____
   Name:
   Title:

2